NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3582-10T1


ELIZABETH GNALL,

    Plaintiff-Appellant/
Cross-Respondent,

v.

JAMES GNALL,

    Defendant-Respondent/
Cross-Appellant.

_____

| APPROVED FOR PUBLICATION |
| :---: |
| **August 8, 2013** |
| **APPELLATE DIVISION** |

       Argued January 29, 2013 - Decided  August 8, 2013

       Before Judges Messano, Lihotz and Kennedy.

       On appeal from the Superior Court of New
       Jersey, Chancery Division, Family Part,
       Bergen County, Docket No. FM-02-2021-08.

       Dale E. Console argued the cause for
       appellant/cross-respondent.

       Barry L. Baime argued the cause for
       respondent/cross-appellant (Budd Larner, PC,
       attorneys; Mr. Baime, of counsel; Donald P.
       Jacobs, on the briefs).

    The opinion of the court was delivered by

LIHOTZ, J.A.D.

    These matrimonial cross-appeals challenge several provisions in a final judgment of divorce entered following a seventeen-day trial, including the propriety of awarding limited

duration alimony following the parties' fifteen-year marriage. Plaintiff Elizabeth Gnall attacks the award of limited duration alimony, suggesting she should have been awarded permanent alimony. She also argues the judge abused his discretion in restricting her access to the awarded supplemental child support in this high income case, and in allocating her equitable entitlement to defendant's 2007 and 2008 bonus income. Defendant James Gnall has abandoned his cross-appeal challenging the amount of alimony, but continues to maintain the child support calculations were erroneous. He also contends the judge abused his discretion when ordering him to pay plaintiff's attorney's fees, and mistakenly set the amount of life insurance he must obtain to guarantee the ordered support obligations. We affirm in part and reverse in part.

I.

The facts are taken from the trial record. Our limited recital is tailored to address only those issues raised on appeal, rather than all issues addressed at trial.

The parties married on June 5, 1993, and have three children, who are now ages fourteen, thirteen, and eleven. In 2008, plaintiff filed a complaint and defendant filed a counterclaim for divorce, each alleging irreconcilable

differences. At the time trial commenced on April 8, 2009, both parties were forty-two years old.

The trial focused on factors necessary to discern the appropriate nature and amount of alimony. The parties presented factual and expert testimony regarding plaintiff's past employment and future employability prospects once she returned to the workforce; defendant's current and anticipated future earnings; and the needs of plaintiff and the children. The parties and their experts testified.

Prior to the parties' marriage, plaintiff received a bachelor's degree in electrical engineering and, while working full-time as an engineer for IBM, obtained a master's degree in computer science. At the time of the marriage, she was employed as a software programmer and systems analyst for the foreign exchange sales group of Goldman Sachs, earning approximately $62,000 per year. She later worked as a senior programmer and analyst for the Government Securities Clearing Corporation, and then as Assistant Vice President at Bankers Trust Corporation, performing computer programing, creating web sites, and developing web interfaces. In 1999, while pregnant with the parties' second child, she left her corporate position to join a friend's start-up company, known as "Visual Tonic." Her salary in 1997 was $115,048. She earned $94,000 for part of 1998 and

$52,202 for part of 1999, the years the two older children were born. Thereafter, with defendant's assent, she stopped working outside the home to principally care for the children. The parties' third child was born in 2002.

At trial, plaintiff explained she believed her programming skills were "obsolete" and needed to be "totally retrained" prior to reentry into the rapidly changing computer field. Moreover, she assumed she would be competing with younger candidates for available entry-level positions. Consequently, she was dissuaded from returning to computer programing and, instead, proposed to pursue a career as a math teacher. She chose teaching based on a perception there existed a "high demand" for such professionals and, more important, because her prospective work schedule would coincide with the children's school day, thereby minimizing childcare costs and any disruption to the children's routine. Plaintiff had investigated the requirements to obtain a teaching certification and believed she could acquire the necessary training through part-time study in four years or less, depending upon the acceptance of previously earned college credits. She initially intended to obtain the necessary degree from William Paterson University, which was proximate to her home, but ultimately enrolled in a three-year online program sponsored by Western

Governors University in Utah. Plaintiff estimated the cost to obtain her degree, excluding books, was approximately $18,610, representing tuition for six semesters at $2935 per block, plus a $1000 student teaching fee.

Plaintiff described her health concerns. She underwent skull-based neurosurgery to remove a mass in November 2006. Resultant nerve damage caused her to experience facial numbness, occasional eye pain, and intermittent noises in one ear. She returns for annual medical reviews of her condition and undergoes an MRI every year. She attended counseling to address stress caused by the divorce and the accompanying litigation. Plaintiff did not believe her medical conditions impeded her ability to resume employment.

Prior to trial, plaintiff participated in employment evaluations, during which she expressed her interest was "raising her children." Elaborating, she said she "had absolutely no interest . . . and ha[d]n't given much thought to her career[,]" although she had taken a community college course providing an overview of veterinary technician careers. She did not desire that job and suggested to defendant's expert she was interested in culinary arts. She expressed a similar sentiment when evaluated by her own expert, stating she might like to work

"at some point in the future," but presently was concerned about the care of the children.

Each party presented expert testimony addressing plaintiff's employment prospects. Defendant offered the opinion of David B. Stein, Ph.D., of Vocational Consulting Group, Inc. Plaintiff then offered the opinion of Charles Kincaid, Ph.D., of Kincaid Vocational & Rehabilitation Services.

Dr. Stein obtained plaintiff's work history and educational background, and developed a "worker trade profile" to identify available jobs matching plaintiff's qualifications or positions she could reasonably become qualified to perform based on her past education and experience. Using United States Department of Labor categories of employment, Dr. Stein opined plaintiff was "very qualified" for and would be "best suited" to continue as a computer programmer or computer software engineer because she had a "very high level of training." He believed plaintiff could readily "update her skills" by obtaining necessary retraining, either online or at universities in the geographic area, in approximately six to twelve weeks, at a cost of $1,000 to $4,000, depending on the type of skills she developed.

Dr. Stein observed computer programming and software engineering positions "exist[ed] in large numbers" and,

according to recent projections from the Department of Labor, were among the occupations expected to grow the fastest over the upcoming decade. He noted computer programmers earned less than software engineers. Nationally, positions in these fields carried an annual salary of between $80,000 and $93,740, with even higher wages, on average, in Bergen County. Because she possessed a "very strong academic, as well as job performance background," Dr. Stein did not view plaintiff's absence from the job market as having a "preclusive" effect on her ability to obtain employment. Dr. Stein opined plaintiff could expect an initial annual salary of between $58,000 and $69,000, but, judging by her past performance, she could anticipate rapid wage growth and, within two or three years, perhaps earn an annual salary in excess of $115,000.

Plaintiff's expert, Dr. Kincaid, similarly focused on plaintiff's return to employment in the computer field, even though he noted she expressed disinterest in such work and "wanted a change[.]" He disagreed with Dr. Stein's conclusions regarding plaintiff's employability, as well as the probable length and cost of retraining, noting hiring trends for computer programmers did not show anticipated growth over the ensuing decade. He agreed, however, "faster than average growth" and "very good prospects" of employment were predicted for computer

systems analysts, a position similar to plaintiff's IBM position, and also for computer software engineers, a field in which plaintiff's skills and educational background were compatible, despite her lack of direct experience.

Using the reported requirements and salaries found in local job advertisements, Dr. Kincaid concluded plaintiff needed to engage in approximately one to two years of retraining to upgrade her skills, at a cost of $10,000 to $15,000. He too discussed plaintiff's possible employment as a software engineer, for which entry level positions included an estimated annual salary of $56,764, and a mean salary of $67,763.

Next, defendant testified as to his employment and income. A certified public accountant, he was working as Chief Financial Officer for the America Financial Group of Deutsche Bank. Defendant's annual compensation included his fixed annual salary and a discretionary bonus paid in February following the close of the calendar year. His bonus payment included cash and deferred equity units, or stock options, restricted by a three- to five-year period of vesting. The following chart sets forth defendant's remuneration from employment as paid in calendar years 2005 through 2010, understanding cash bonuses and equity units were paid in the February following the close of the actual compensation year on which they were based.

A-3582-10T1

| YEAR | SALARY | CASH BONUS | EQUITY UNITS | TOTAL COMPENSATION |
|---|---|---|---|---|
| 2005 | $185,000 | $ 325,000 | | $ 510,000 |
| 2006 | $185,000 | $ 481,100 | $ 84,900 | $ 751,000 |
| 2007 | $200,000 | $ 718,702 | $ 97,298 | $1,016,000 |
| 2008 | $200,000 | $ 766,507 | $108,493 | $1,075,000 |
| 2009 | $200,000 | $1,296,806 | $303,194 | $1,800,000 |
| 2010 | $400,000 | $ 788,899 | $683,326 & $227,775[1] | $2,100,000 |

Defendant specifically addressed his 2008 bonus. He stated the terms of the bonus were negotiated in July 2008, as part of his promotion, which post-dated plaintiff's complaint for divorce. The 2008 bonus check (received in February 2009) was not directly deposited into the parties' joint checking account, as was the custom with prior bonuses. Rather, defendant deposited the check into an account titled solely in his name. Although a portion of the cash bonus may have been used for pendente lite support, defendant argued plaintiff was not entitled to an equitable share of the funds because he received the money as part of his promotion, not as a result of his past performance.

Evidence of the parties' expenses and the marital lifestyle was also presented. Both parties marked into evidence their respective original and revised Case Information Statements

---

[1] In 2010, defendant was awarded an annual incentive award, which vests over three years.

(CIS), and plaintiff presented expert testimony from Rufino Fernandez, Jr., CPA, a forensic accountant.

At the time of trial, the parties' Ridgewood marital home had been sold, plaintiff and the children were renting a smaller residence in Ridgewood, and defendant had moved to an apartment in Manhattan's upper west side. Plaintiff's initial CIS was based on the costs of the marital home and listed monthly expenses totaling approximately $35,000. Her budget was revised to $21,041 per month to reflect her change in residence.[2] On the other hand, defendant reported the family's joint marital lifestyle while living in Ridgewood was $23,664 per month, of which he allocated $10,906 for his needs. He too modified his budget after moving to New York City, claiming monthly expenditures of $19,803.

During the marriage, plaintiff handled the family's finances. Defendant's paycheck was directly deposited into the joint checking account, from which plaintiff paid utilities, food, and smaller landscaping bills. Similarly, the cash portion of defendant's bonus was directly deposited into the joint checking account and disbursed by plaintiff to cover current and future anticipated expenses. For example, in 2007,

---

[2]     In the course of the trial, the marital home was sold, netting $797,411.

a portion of the bonus remuneration was placed in savings; $10,000 was placed in each of the children's uniform gift to minor's accounts (UGMA); $10,000 was used to reduce the principal balance of the mortgages; a sum was set aside to satisfy the resultant tax obligations; and the remainder was used to pay credit card bills, car expenses, the monthly mortgages, real estate taxes and insurances, large landscaping bills, and the like.

Defendant drove a 2008 Infiniti M45 after trading in a 1998 Nissan Maxima. His monthly car payment was $1,039. Plaintiff drove a 2007 Cadillac Escalade, which was encumbered by a loan requiring a monthly payment of $1,583. Plaintiff explained groceries were purchased from Whole Foods or Kings, clothing was bought from Talbots, Nordstrom, Macy's, Ann Taylor, Victoria's Secret, Lilly Pulitzer, and the Gap, and defendant's suits were purchased from Barney's in New York City. The family enjoyed multiple vacations each year, which had included ski trips to Aspen and Switzerland, stays at Disney World, ocean front rentals in the Outer Banks, North Carolina, and shorter trips to Rhode Island and Boston. Plaintiff insisted the parties always had money to buy whatever they wanted and never worried; they always paid their expenses when incurred; and other than the mortgages and car loans, they had no debts. The children

attended public school and were involved in several other extracurricular activities, such as sports and music lessons. Each child was engaged in counseling to address issues arising from their parents' divorce.

Plaintiff's expert, Fernandez, prepared a lifestyle analysis after interviewing plaintiff and reviewing the historic Quicken checking expenses, other bank account records, and investment documentation for the period from 2004 to 2007. Fernandez admitted plaintiff reviewed his preliminary drafts to verify the accuracy of his proposed expense allocations, he did not consult with defendant. In order for plaintiff and the children to maintain the marital lifestyle, Fernandez opined she would need $24,252 per month, plus additional monies for savings and income tax obligations resulting from the alimony receipts.[3]

On cross-examination, the accuracy of Fernandez's report was attacked. Defendant showed Fernandez had artificially inflated the total needs of plaintiff and the children by: including miscellaneous expenses that were actually transfers between accounts, not expenses; including costs expended for the

---

[3] Fernandez determined the amount of the parties' savings over the years was: $58,692 in 2004; $148,184 in 2005; $239,078 in 2006; and $334,651 in 2007.

benefit of defendant; and doubling actual vacation costs and a portion of the cash expenditures.

Defendant's testimony emphasized his financial success was recent and not representative of the marital lifestyle. He also argued the parties had recently increased their household expenditures by using a home equity loan to build an addition to the home, and by buying newer cars. He asserted these expenses should not be considered when calculating the standard of living enjoyed during the marriage.

Reviewing the evidence submitted, the trial judge concluded the parties enjoyed "an upper middle class" lifestyle that was more modest than what could be afforded on defendant's more recent remuneration. He fixed the monthly needs of plaintiff and the three children at $18,000. After concluding plaintiff could return to the computer field and earn "between $61,200 and $94,000," he considered the alimony factors, understanding his obligation to make statutory findings. He found the parties' fifteen-year marital relationship was "not short term[.]" Nevertheless, when he weighed the "relatively young" age of the parties, and their good health and education, which allowed them to obtain employment "at good salaries" and thereby support "excellent lifestyles for themselves and their children[,]" the judge concluded "the parties were not married long enough and

are not old enough for [defendant] to be responsible to maintain that lifestyle permanently for [plaintiff]." He therefore concluded, "this is not a permanent alimony case."

The judge also rejected an award for rehabilitative alimony. Even though he acknowledged plaintiff needed retraining, he found plaintiff could take classes online at her own pace. The judge also noted plaintiff had failed to work toward obtaining employment during the two years the case was pending. Consequently, he imputed $65,000 annual income to her, effective immediately, and awarded $18,000 per month limited duration alimony for eleven years. The alimony award was to terminate on September 1, 2021, coincident with the youngest child's anticipated departure for college. Further, the award would not be subject to modification based on plaintiff's future earnings; rather, modification would be permitted only upon either party's death or plaintiff's remarriage.

The initial child support calculations made following trial were challenged in post-judgment motions. At that time, the judge corrected an error and re-calculated child support under the guidelines as $997 per week. He added a supplemental support award of $1600 per month per child, requiring the maximum gift tax amount (currently, $13,000 per year) be deposited into the children's UGMA accounts, unless the parties

agreed otherwise. Any remaining sums would be paid monthly to plaintiff to use as she saw fit.

The judge concluded the marital portion of defendant's 2008 bonus (paid in February 2009) was limited to the proportionate amount represented by the period prior to the filing date of the complaint, that is January 1, to March 10, 2009. The judge calculated the total marital portion as $216,700 and concluded, "at best plaintiff's share would be fifty percent, or $108,300." However, the judge determined plaintiff's interest was offset by her past receipt of tax-free pendente lite support and other lump sum payments made during the two-year litigation.

Defendant was ordered to maintain $3 million in life insurance during the limited duration alimony term. When alimony ended, he was permitted to reduce the life insurance to $1 million until the emancipation of the children. Finally, defendant was ordered to satisfy the outstanding $105,423.86 balance plaintiff owed to her attorney.

Motions were filed for reconsideration of some determinations and for clarification of others. As noted, the amount of child support was adjusted. Also, the judge denied defendant's cross-motion to reduce the life insurance obligation to the actual amount of alimony due. Thereafter, plaintiff

appealed and defendant cross-appealed from designated provisions of the judgment.

## II.

Our review of a trial court's factual findings is limited. N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 278-79 (2007) (citation omitted). "The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998) (citing Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484 (1974)). We defer to credibility determinations because a trial court "'hears the case, sees and observes the witnesses, [and] hears them testify,'" affording it "'a better perspective than a reviewing court in evaluating the veracity of witnesses.'" Id. at 412 (quoting Pascale v. Pascale, 113 N.J. 20, 33 (1988) (internal quotation marks and citations omitted)).

Further, we recognize the "special expertise" of judges in addressing discretionary matters in the Family Part. Therefore, if the trial judge's conclusions are evidentially supported, we are inclined to accept them. Ibid. Consequently, we do "not disturb the 'factual findings and legal conclusions of the trial judge unless . . . convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and

reasonably credible evidence as to offend the interests of justice.'" Ibid. (internal quotation marks and citations omitted). "Only when the [trial] court's conclusions are so 'clearly mistaken' or 'wide of the mark'" that the judge was obviously mistaken, should we interfere and make our own findings to "ensure that there is not a denial of justice." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007)).

On the other hand, our review of a trial court's legal conclusions is always plenary. D.W. v. R.W., 212 N.J. 232, 245-46 (2012) (citing Balsamides v. Protameen Chems., 160 N.J. 352, 372 (1999)). We are not bound by "[a] trial court's interpretation of the law and the legal consequences that flow from established facts[,]" which "are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

### III.

#### A.

Plaintiff's principal challenge on appeal attacks as error the judge's award of limited duration alimony. Plaintiff succinctly asserts: "This is a permanent alimony case."

"Alimony is a claim arising upon divorce, which is rooted in the parties' prior [financial] interdependence" created during their marital relationship. Reese v. Weis, 430 N.J. Super. 552, 569 (App. Div. 2013). Whether alimony should be awarded is governed by distinct, objective standards defined by the Legislature in N.J.S.A. 2A:34-23b. When alimony is requested, the statute demands the court consider and make specific findings regarding:

> (1) The actual need and ability of the parties to pay;
>
> (2) The duration of the marriage or civil union;
>
> (3) The age, physical and emotional health of the parties;
>
> (4) The standard of living established in the marriage or civil union and the likelihood that each party can maintain a reasonably comparable standard of living;
>
> (5) The earning capacities, educational levels, vocational skills, and employability of the parties;
>
> (6) The length of absence from the job market of the party seeking maintenance;
>
> (7) The parental responsibilities for the children;
>
> (8) The time and expense necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment . . . ;

(9) The history of the financial or non-financial contributions to the marriage or civil union by each party including contributions to the care and education of the children and interruption of personal careers or educational opportunities;

(10) The equitable distribution of property ordered . . . ;

(11) The income available to either party through investment of any assets held by that party;

(12) The tax treatment and consequences to both parties of any alimony award . . . ;

(13) Any other factors which the court may deem relevant.

[N.J.S.A. 2A:34-23b.]

The law compels judges to weigh all of these statutory factors to determine whether alimony is appropriate and, if so, ascertain the nature and calculate the amount of alimony needed by the dependent spouse. See N.J.S.A. 2A:34-23c (requiring the court to "make specific findings on the evidence" regarding statutory factors relevant to an alimony award). This process is designed to account for the unique needs and abilities affecting each dependent spouse,[4] as well as the financially

_____

[4]    Although we limit the context of our discussion based on the facts of this case to spouses, we note the statute equally applies to partners dissolving their civil unions pursuant to N.J.S.A. 2A:34-2.1.

secure spouse called on to continue support after the marriage ends in divorce. Certainly,

> [a] trial court's findings regarding alimony should not be vacated unless the court clearly abused its discretion, failed to consider all of the controlling legal principles, made mistaken findings, or reached a conclusion that could not reasonably have been reached on sufficient credible evidence present in the record after considering the proofs as a whole. <u>Heinl v. Heinl</u>, 287 <u>N.J. Super.</u> 337, 345 (App. Div. 1996). Substantial weight should be given to the judge's observations of the parties' demeanor and credibility. <u>Ibid.</u>
>
> [<u>J.E.V. v. K.V.</u>, 426 <u>N.J. Super.</u> 475, 485 (App. Div. 2012).]

We need not detail the four types of statutorily authorized alimony and the policy considerations underlying the Legislature's creation of each distinct category of alimony awards. Instead, we rely on the comprehensive analyses contained in two opinions of this court, which have scrupulously reviewed these topics. <u>See</u> <u>J.E.V.</u>, <u>supra</u>, 426 <u>N.J. Super.</u> at 484-89; <u>Cox v. Cox</u>, 335 <u>N.J. Super.</u> 465, 473-76 (App. Div. 2000).

We nevertheless emphasize that judges considering an alimony request must always keep in mind the primary "purpose of awarding alimony to a spouse is based on 'an economic right that arises out of the marital relationship and provides the dependent spouse with a level of support and standard of living

generally commensurate with the quality of economic life that existed during the marriage.'" Clark v. Clark, 429 N.J. Super. 61, 72-73 (App. Div. 2012) (quoting Mani v. Mani, 183 N.J. 70, 80 (2005) (internal quotation marks and citations omitted)). The economic dependence created as a result of the marital relationship is a crucial finding necessary to impose the ongoing financial entanglement of an alimony award. The law attributes a party's individual success to have been achieved by virtue of the joint union — "a shared enterprise, a joint undertaking, that in many ways . . . is akin to a partnership." Rothman v. Rothman, 65 N.J. 219, 229 (1974). See also Guglielmo v. Guglielmo, 253 N.J. Super. 531, 543 (App. Div. 1992) ("We are entirely satisfied that a spouse who maintains the home while her husband's career advances should share in the rewards of their combined efforts." (citations omitted)).

Finally, a judge awarding alimony must methodically consider all evidence to assure the award is "fit, reasonable and just" to both parties, N.J.S.A. 2A:34-23, and properly balances each party's needs, the finite marital resources, and the parties' desires to commence their separate futures, N.J.S.A. 2A:34-23c. Parties must not forget, "alimony is neither a punishment for the payor nor a reward for the payee." Mani, supra, 183 N.J. at 80 (citations omitted).

Here, our focus is not whether alimony should be awarded; the parties agree alimony is warranted. Instead we are asked what type of alimony suits the facts presented, and whether a limited duration award was appropriate.

In examining any alimony request, the court begins its analysis by considering whether permanent alimony should be awarded.[5] N.J.S.A. 2A:34-23c. Not every dependent spouse should receive a permanent alimony award. "If the court determines that an award of permanent alimony is not warranted, the court shall make specific findings on the evidence setting out the reasons therefor." Ibid. Only then must the court "make specific findings" on the applicability of the three remaining authorized alimony awards — limited duration, rehabilitative, and reimbursement — to discern which one or any combination of the three is "warranted by the circumstances of the parties and the nature of the case." N.J.S.A. 2A:34-23f.

J.E.V. and Cox have painstakingly compared and contrasted awards of permanent alimony and limited duration alimony, and these cases include a recitation of the legislative history underpinning the purpose in adopting limited duration alimony.

---

[5] "The Legislature's use of the term permanent alimony is a misnomer in the sense that the award is not everlasting[;]" it is subject to modification based on statutory events and other changed circumstances. Reese, supra, 430 N.J. Super. at 575.

Briefly, limited duration alimony was designed "to fill a 'void' identified by the Commission to Study the Law of Divorce." Gordon v. Rozenwald, 380 N.J. Super. 55, 65 (App. Div. 2005) (citing Sponsor's Statement to Senate Bill No. 54 (1998); Report of the Commission to Study the Law of Divorce 35 (Apr. 18, 1995)). The undeniable rationale in adding limited duration alimony as a remedy was to address a dependent spouse's post-divorce needs following "'"shorter-term marriages where permanent or rehabilitative alimony would be inappropriate or inapplicable but where, nonetheless, economic assistance for a limited period of time would be just."'" J.E.V., supra, 426 N.J. Super. at 485-86 (quoting Cox, supra, 335 N.J. Super. at 477 (quoting S. No. 54, at 6-7, 208th Leg. (N.J. 1998) (statement of Sens. Kavanaugh & Martin))).[6]

> Limited duration alimony, like permanent alimony, is based primarily on the marital enterprise. It is distinguishable from permanent alimony because the length of the marriage does not warrant permanent support . . . . In order to avoid misuse of limited duration alimony to the disadvantage of supported spouses divorcing after a long-term marriage, the law prohibits award of

---

[6]    In May 2011, the United States Census Bureau reported the results of the Survey of Income and Program Participation (SIPP) by the American Community Survey, showing the current average length of marriage is eight years. See Rose M. Kreider & Renee Ellis, Number, Timing and Duration of Marriages and Divorces, at 15 (2011), available at http://www.census.gov.prot/2011pubs/p70-125.pdf.

> limited duration alimony "as a substitute for permanent alimony in those cases where permanent alimony would otherwise be awarded." N.J.S.A. 2A:34-23c[.]
>
> [Gordon, supra, 380 N.J. Super. at 66.]

Thus, "limited duration alimony represents a form of limited spousal support for a specified purpose, namely to provide economic assistance for a restricted period of time," Gonzalez-Posse v. Ricciardulli, 410 N.J. Super. 340, 354 (App. Div. 2009) (citing Gordon, supra, 380 N.J. Super. at 65), by "offer[ing] a benefit to spouses deserving of alimony for a limited time . . . [,] who would be unlikely to receive any alimony under [the prior] statutory scheme," Gordon, supra, 380 N.J. Super. at 65 (internal quotation marks and citations omitted). As such,

> [l]imited duration alimony is not intended to facilitate the earning capacity of a dependent spouse or to make a sacrificing spouse whole, but rather to address those circumstances where an economic need for alimony is established, but the marriage was of short-term duration such that permanent alimony is not appropriate. Those circumstances stand in sharp contrast to marriages of long duration where economic need is also demonstrated. In the former instance, limited duration alimony provides an equitable and proper remedy. In the latter circumstances, permanent alimony is appropriate and an award of limited duration alimony is clearly circumscribed, both by equitable considerations and by statute.
>
> [Cox, supra, 335 N.J. Super. at 476 (emphasis added).]

24

Implicated by plaintiff's argument on appeal in this matter is whether a marriage lasting three months shy of fifteen years is the type of "shorter-term marriage[]" for which limited duration alimony was adopted by the Legislature. In both Cox and J.E.V., the propriety of the trial judge's award of limited duration alimony was challenged. In each case, a significant determining factor was the length of the respective marriage. Certainly, "[t]he 'defining distinction' between permanent and limited duration alimony is the length of the marriage." J.E.V., supra, 426 N.J. Super. at 488 (quoting Cox, supra, 335 N.J. Super. at 483). The Coxes had been married for twenty-two years, a circumstance clearly removing any possibility of a limited duration alimony award. Cox, supra, 335 N.J. Super. at 483. In J.E.V., supra, we reviewed the trial judge's rejection of the plaintiff's request for permanent alimony in favor of an award of limited duration alimony following an almost ten-year marriage. 426 N.J. Super. at 480-81.

Assessing the facts here, the trial judge correctly identified this marriage's length as "not short-term." He further acknowledged plaintiff would be unable "to maintain the marital lifestyle without alimony now and probably not for some time[.]" Nevertheless, he concluded, consideration of an award of permanent alimony was obviated by the parties' relatively

25

young ages and the fact that they were not married long enough — commenting theirs was not a twenty-five to thirty-year relationship. This conclusion was error and must be reversed.

Contrary to the judge's belief, permanent alimony awards are not reserved solely for long-term marriages of twenty-five to thirty years. While marital relationships of such duration, when coupled with a created economic dependence by one party, typically result in permanent alimony awards, there is no per se rule that permanent alimony is unwarranted unless the twentieth anniversary milestone is reached. Moreover, any attempt to reduce the shared marital experience to a formulaic calculation of compensation based on the number of years "in the marriage," completely disregards the public policy considerations supporting continuation of economic support beyond the spouses' joined personal lives.

Although "[c]ourts must consider the duration of the marriage" when fixing alimony, "the length of the marriage and the proper amount or duration of alimony do not correlate in any mathematical formula." Lynn v. Lynn, 91 N.J. 510, 517-18 (1982). The Legislature's confining limited duration alimony awards to those "shorter-term marriages," where the facts make a permanent alimony award "inappropriate or inapplicable," reinforces this concept. J.E.V., supra, 426 N.J. Super. at 485-

86 (internal quotation marks and citations omitted) (emphasis added).

We do not intend to draw specific lines delineating "short-term" and "long-term" marriages in an effort to define those cases warranting only limited duration rather than permanent alimony. We also underscore it is not merely the years from the wedding to the parties' separation or commencement of divorce that dictates the applicability or inapplicability of permanent alimony. Nevertheless, we do not hesitate to declare a fifteen-year marriage is not short-term, a conclusion which precludes consideration of an award of limited duration alimony.

A dependent spouse's age alone also cannot obviate permanent alimony. See Robertson v. Robertson, 381 N.J. Super. 199, 207-08 (App. Div. 2005) (finding thirty-nine-year-old woman who surrendered employment opportunities was entitled to permanent alimony after a twelve-year marriage). Admittedly, a spouse's youth, along with prior education and skills, may tip the scale toward a lesser amount of alimony based on the prospects of viable future employment. But youth is merely one factor weighed in the alimony calculus.

All facts regarding each unique marital partnership must be evaluated when considering evidence regarding a claim of economic dependence warranting long-lasting support. Compliance

with the statute is not accomplished by a listing of facts. Rather, the statute mandates an analysis of the relationship of these facts, culminating in an assessment of their respective importance. For example, when considering the applicability of a permanent alimony award, the length of the marriage and the parties' ages are finite facts that must be considered. N.J.S.A. 2A:34-23b(2)(3). However, the statute's enumerated considerations implicate other aspects of the marital relationship that also must be weighed. These include factors such as the duration and cause of the claimed economic dependence; sacrifices made to assure the non-dependent spouse's financial success; whether the dependent spouse's return to full-time employment causes disruption to the needs of the children; and the nature and extent of the dependent spouse's predicted financial independence, measured against the non-dependent spouse's continued ability to provide financial assistance.

In this matter, facts relevant to plaintiff's request for permanent alimony are many. A significant relevant fact is her monthly budget, representing the marital standard of living of $18,000 per month, or $216,000 per year. This amount was found to represent an "upper-middle-class" marital standard of living, which was more modest than current earnings would be able to

maintain. Nevertheless it is an amount plaintiff cannot achieve independent of defendant's support.

Also, for more than two-thirds of the marriage, plaintiff functioned as the primary caretaker for the children and homemaker for the family, foregoing any earning capacity and professional success she may have achieved during this period. She had not worked since 1999. She initially left employment largely because the parties decided their two children, separated in age by only a year, needed her care and attention. Thereafter, plaintiff was the homemaker and primary caretaker for the parties' three children.

Under the divorce judgment, defendant's parenting time was set as every other weekend and, when he was able, dinner on Wednesdays. Plaintiff, on the other hand, continued to bear the lion's share of parenting responsibilities for their three minor children. The parenting time schedule permits defendant to continue his professional endeavors, substantially free of daily child rearing concerns, such as assisting with homework, planning and preparing meals, scheduling activity, and shopping for the children's needs.

Undoubtedly, plaintiff is intelligent, educated, and capable of professional employment, but under any conceivable scenario, her re-employment requires retooling before reentry

into the job market. Further, it is unrealistic to assume plaintiff could generate earnings sufficient to maintain the determined marital standard of living. Expert testimony, credited by the judge, estimated plaintiff's return to the computer field could, after a few years, eventually result in earnings of $115,000. This is a far cry from the marital standard of living calculated by the court, necessitating $216,000 net per year. Thus, the record does not support that plaintiff would be able to resume working and earn an amount to sustain herself in a manner approaching that which the parties created and enjoyed during the marriage.

Throughout the marriage, defendant pursued his career, uninterrupted by responsibilities of bearing and caring for children. His intelligence, drive, and abilities have allowed him to achieve notable professional success, which is accompanied by significant remuneration. The surge in his earnings and the accompanying increase in the marital standard of living began in the latter third of the marriage, with his employment at Deutsche Bank in 2003. He is fortunate, as there is no contesting the fact he can, without sacrifice, support plaintiff and the children, as well as himself in accordance with the marital standard of living.

Each of these considerations must be weighed when considering plaintiff's request for permanent alimony. Following our review, we conclude the judge, however, incorrectly evaluated the evidence, primarily rejecting permanent alimony because of the misconception that a fifteen-year marriage would not support a permanent alimony award. This legal error permeated his overall consideration of other statutory factors, resulting in an impermissibly conclusory and cursory analysis. See Carter v. Carter, 318 N.J. Super. 34, 42 (App. Div. 1999) (criticizing trial judge's failure to adhere to statutory mandate of N.J.S.A. 2A:34-23b).

We conclude the trial judge failed to fully assess all evidence regarding the fifteen-year marital enterprise, including plaintiff's inability to achieve something close to the marital standard of living in the future, without the benefit of defendant's economic assistance. The failure to adhere to the statutory obligation to "make specific findings on the evidence about [all] the above factors[,]" N.J.S.A. 2A:34-23c, was error. Accordingly, the award of limited duration alimony is reversed and the matter is remanded for an evaluation of an award of permanent alimony. See Gotlib v. Gotlib, 399 N.J. Super. 295, 309 (App. Div. 2008) (providing if a "court

ignores applicable standards, we are compelled to reverse and remand for further proceedings").

## B.

Plaintiff next argues the judge abused his discretion in averaging the parties' expenses over several years when computing the marital lifestyle and plaintiff's needs. She suggests the judge's calculations "perpetuate the impoverishment of the dependent spouse." We are not persuaded.

We reject plaintiff's suggestion that the marital standard of living, as used in N.J.S.A. 2A:34-23b(4), is defined by the dollar amount of expenses incurred immediately prior to filing for divorce. The "standard of living enjoyed during the marriage" is a concept that certainly includes objective criteria, such as the actual amount spent for mortgages, real estate taxes, car payments, and food expenses. However, it also encompasses more subtle components such as the intervals between car purchases, whether there has been a preference for new or pre-owned vehicles, and the frequency of and nature of restaurants when dining out.

This record reflects the trial judge's keen awareness of all aspects of the parties' standard of living. He stated the parties lived well, but not extravagantly, and spent less than what defendant's salary suggested could be afforded. He

accepted much of plaintiff's claimed budget, though reduced to disallow certain inflated or inapplicable expenses. The judge's assessment of the substantial, credible evidence resulted in a reduction from plaintiff's asserted monthly expenses of $21,041 to the $18,000 budget the judge found to more accurately reflected expenses.

Further, the judge fully assessed plaintiff's needs in reaching his findings. The judge understood plaintiff's CIS budget addressed the needs of plaintiff and the children, and did not include a reserve for income taxes or savings. We determine that once the children's needs, satisfied by the basic and supplemental child support awards, are removed, the monthly sum awarded sufficiently includes estimated income taxes.

However, we cannot discern from the opinion what findings and conclusions were drawn regarding plaintiff's requested savings component, supported by Fernandez's testimony, which opined on the level of savings by the parties over the last four years. Indeed, a court may design an award sufficient to permit the supported spouse to bolster his or her savings to "protect . . . against the day when alimony payments may cease" due to the supporting spouse's death or other change in circumstances. Khalaf v. Khalaf, 58 N.J. 63, 70 (1971) (citation omitted).

"Trial judges are under a duty to make findings of fact and to state reasons in support of their conclusions." Heinl v. Heinl, 287 N.J. Super. 337, 347 (App. Div. 1996) (citing R. 1:7-4). "'Meaningful appellate review is inhibited unless the judge sets forth the reasons for his or her opinion.'" Strahan v. Strahan, 402 N.J. Super. 298, 310 (App. Div. 2008) (quoting Salch v. Salch, 240 N.J. Super. 441, 443 (App. Div. 1990)). On remand, we direct the judge to review and make findings regarding N.J.S.A. 2A:34-23b(8), which requires alimony awards take into consideration "the opportunity for future acquisitions of capital assets and income[.]" The court must clearly set forth factual findings and legal conclusions for the benefit of the parties and to aid appellate review. See R. 1:7-4(a) (denoting a trial court's obligation to make findings of fact and state conclusions of law following hearings resulting in orders appealable as of right).

## C.

Plaintiff argues the court erred in imputing income to her of $65,000 per year. Further, the judge "unfairly" concluded she had "done nothing" pendente lite to obtain employment, and erred in immediately imputing this level of earnings, without allowing any period for retraining and workforce reentry. Although we would have preferred more detailed factual findings

34

regarding imputed income, we cannot agree the income imputation or its amount was erroneous. However, we must remand regarding the effective date of imputation, as there is no evidence to support the court's conclusion plaintiff could immediately commence earning $65,000 per year.

In computing alimony, "[i]ncome may be imputed to a party who is voluntarily unemployed or underemployed." Golian v. Golian, 344 N.J. Super. 337, 341 (App. Div. 2001) (citation omitted). "Imputation of income is a discretionary matter not capable of precise or exact determination but rather requiring a trial judge to realistically appraise capacity to earn and job availability." Storey v. Storey, 373 N.J. Super. 464, 474 (App. Div. 2004) (citation omitted). A trial judge's determination in this regard will not be disturbed absent an abuse of that discretion. Robertson, supra, 381 N.J. Super. at 206.

In deciding if income should be imputed, the court must determine "whether the [spouse] has just cause" for voluntarily remaining unemployed or underemployed. Caplan v. Caplan, 182 N.J. 250, 268 (2005). In assessing just cause, the court should assess factors such as the ages of the children and "the reason and intent for the voluntary underemployment or unemployment[.]" Pressler & Verniero, Current N.J. Court Rules, Appendix IX-A, Comment 12, at 2551 (2013).

Here, the judge properly performed this analysis. Although plaintiff had been absent from the workforce for many years, she retains the obligation to contribute to her support. Both when setting child support and in reaching a proper alimony award, a judge must examine not only each party's income, but also his or her earning ability. See Lynn v. Lynn, 165 N.J. Super. 328, 341-42 (App. Div.) (noting earning capacity or prospective earnings are proper elements for the court's consideration when determining the amount of alimony to be paid), certif. denied, 81 N.J. 52 (1979).

Relying on the experts' opinions and plaintiff's past achievements, education, and experience, the judge concluded plaintiff's employment as a computer programmer would result in a salary between $61,200 and $94,000. He chose to impute income toward the lower end of this range, $65,000, understanding time had elapsed since plaintiff last performed the tasks of this job. We conclude the substantial, credible evidence in the record supports this finding, which will not be disturbed. Cesare, supra, 154 N.J. at 412.

We also reject as unfounded plaintiff's argument that the judge should have imputed income based on plaintiff's plans to become a teacher, rather than a computer programmer. Imputation must be based on earning capacity, not employment desires.

Plaintiff remains free to pursue her dreams as "[a]ny party is free to retire, take a vow of poverty, write poetry or hawk roses in an airport, if he or she sees fit." Deegan v. Deegan, 254 N.J. Super. 350, 358-59 (App. Div. 1992). However, she may not shed her obligations to contribute as best she is able to her support and that of her children. Ibid.

The record, however, does not support the judge's finding plaintiff had "voluntarily chosen not to become employed" by failing to obtain employment or retraining pendente lite. We are aware of no authority mandating a dependent spouse, absent from the workforce, by agreement, for a significant period of time, to immediately prepare for and return to work pendente lite, absent notice of this expectation presented by motion or court directive. We are not suggesting able spouses do not hold a responsibility to support themselves; we are only finding there is no support in this record for the judge's conclusion resulting in the immediate imputation of $65,000 annual income.

Both employability experts agreed plaintiff needed a period of retraining before she would be able to secure employment. Plaintiff had not worked in ten years and her past skills were stale. Plaintiff's lack of outside employment over this period in part resulted from the need to care for three children, and likely was reinforced by defendant's financial success.

37                                          A-3582-10T1

Beginning in 2007, defendant's total annual compensation topped $1 million. Also, in 2006, plaintiff underwent brain surgery. Moreover, the issue of plaintiff's return to work was never broached pendente lite. The pendente lite record contains no request by defendant for plaintiff's resumption of employment, and there are no orders mandating she secure retraining or allocating funds to enable her to seek training or "prepare herself to re-enter the workforce," as the trial judge found she neglected to do.

Overall, we do not view these facts as obviously presenting a mandate for plaintiff's resumption of employment pendente lite. Unlike a short-term marital relationship, one where both parties had continuously worked but one suddenly stopped, or one where the parties had no children and their needs could not be sustained solely by one working spouse, the facts here do not suggest the parties themselves anticipated an immediate resumption of employment by the dependent spouse. Rather, these facts strongly suggest the parties held no expectation plaintiff should immediately return to work.

This determination does not diminish plaintiff's ultimate responsibility, and we agree the obligation to contribute to her own and the children's support has been satisfactorily shown. We conclude, however, the judge abused his discretion by

A-3582-10T1

immediately imputing a prospective salary attainable only upon retraining, as no evidence supports the finding plaintiff ignored her pendente lite responsibilities to obtain work. This portion of the judgment is reversed. On remand, the effective date of imputation must be made based on the evidential record, after consideration of the time and cost for plaintiff's retraining.

D.

Next, both parties challenge the amount awarded for child support: plaintiff argues the award was too low, and defendant argues it was too high. The lack of meaningful factual findings requires this issue also be reexamined.

Initially, the court calculated a basic support award, using the Child Support Guidelines (guidelines), R. 5:6A, of $501 per week. The judge further ordered a supplemental award of $25,000 per child per year, from which the maximum allowable federal gift tax exclusion was to be deposited into each of the children's existing UGMA for higher education, and the balance remitted to plaintiff in equal monthly installments.

Following plaintiff's post-judgment motion, an error in the basic child support calculation was identified and corrected to $997 per week. The court then adjusted the supplemental award, reducing it to $1600 per month, or $19,200, presumably per child

per year. Plaintiff agrees the amount of the supplemental award should have been modified after correction to the base guidelines amount. However, she claims an abuse of discretion occurred because total support was reduced and the supplemental support was restricted to require deposit into the children's UGMA accounts, absent the parties' agreement otherwise. Plaintiff seeks unrestricted control of the entire supplemental child support award.

Defendant argues the child support exceeds what is necessary to meet the family's lifestyle, and the basis for the amount of the supplemental award was not sufficiently stated, making it unfounded. Also, he argues, following the correction, child support was increased by $8392 per year, without explanation.

Even though a supplemental support amount in addition to the guideline's base amount is authorized because of the parties' high level of income, the judge must identify the nature of the children's supplemental needs to be satisfied by the supplemental support awarded. See Caplan, supra, 182 N.J. at 272 (noting that the trial court may take any reasonable approach in arriving at an appropriate award); Strahan, supra, 402 N.J. Super. at 309-10 (same). We reject claims that the judge improperly considered the parties' past practice of

funding the children's anticipated higher education costs through annual deposits into the UGMA accounts. See Strahan, supra, 402 N.J. Super. at 311 (criticizing an above-guidelines child support award absent evidence of some "marital standard" regarding "the way the parties treated the children"). We merely require the court to express those needs, in addition to the annual past practice of saving for the children's education, to be satisfied by the supplemental support award.

Following our review, we agree necessary factfinding to sustain the supplemental support award must be enhanced. The judge must explain how the amount of the supplemental award was calculated, and the circumstances considered in restricting an amount designated for deposit into the UGMA accounts. Finally, the judge must explain why the total support amount changed, after it was corrected to comply with the guidelines.[7]

We generally reject defendant's argument that the basic child support amount was too high in light of the court's findings regarding the family's budget. The $18,000 per month needs did not include the tax obligation associated with plaintiff's alimony receipt. 26 U.S.C.A. § 71(a) (stating "[g]ross income includes amounts received as alimony"). We

---

[7] Our calculations align with defendant's, such that the total of all support — basic and supplemental — increased by $8392 per year.

reject as specious defendant's contention the total alimony and child support receipts exceeded plaintiff's budget. Nevertheless, based on our conclusions regarding the need to review the alimony award, we note that if the amount of alimony is adjusted, the amount of basic child support must be recomputed.

E.

In her final points, plaintiff argues the court abused its discretion in: (1) awarding her one-half of the remainder of defendant's 2007 cash bonus paid in 2008, as support, rather than granting her allocable share as equitable distribution; and (2) concluding she received her interest in defendant's 2008 bonus as pendent lite support. Plaintiff also urges modification of the division of the 2009 income tax refunds.

Pendente lite, the motion judge ordered an equal distribution of the funds remaining from the 2007 cash bonus, in lieu of immediately calculating defendant's monthly support obligation. The dispute centered on whether the bonus received and deposited into the joint checking account was an asset subject to equitable distribution, for which plaintiff's entitlement was distinct. Plaintiff maintains allowing use of the monies to satisfy defendant's pendente lite support

A-3582-10T1

obligations was legal error. She argues defendant retained his base salary and half of his bonus and did not pay support.

Shortly after the gross bonus of $766,507 was received in February 2008, the complaint for divorce was filed and pendente lite requests were considered. Because the court divided the balance of the monies held in the checking account to satisfy pendente lite support, plaintiff states she exhausted her share of the asset to meet ongoing household expenses that should have been provided by defendant's current income. On the other hand, defendant was not only freed from paying pendente lite support, but also retained his salary and his share of the asset for his own use and enjoyment.

Following trial, the judge did not consider this issue, though it had been reserved for final determination in the pendente lite order. On remand, the treatment and allocation of the 2007 bonus paid in February 2008 must be considered.

As for the 2008 bonus, the judge determined the amount subject to equitable distribution was limited to the period of the marriage, ending upon the initiation of the divorce action. The complaint was filed on March 10, 2008, so plaintiff's one-half interest in the sum earned between January 1, and March 10, 2008, was calculated as $108,300. The judge then concluded, "whatever amount was due [plaintiff] from the 2008 bonus ha[d]

been more than offset by the more than two years of tax[-]free payments, both lump sum and periodic, [she] ha[d] received during the pendency of the divorce action[,]" computed to average approximatly $22,000 per month.

At trial, defendant argued he negotiated his bonus, paid in February 2009, at the time of his promotion in May 2008 — two months following plaintiff's filing for divorce. The trial judge's opinion does not make specific credibility findings, but the inference to be made from the decision is that the judge accepted defendant's testimony regarding his negotiation of the 2008 bonus. The record contains no contrary information. On appeal, plaintiff urges a different treatment of the bonus funds, baldly asserting the bonus amount resulted from "the momentum and impact of the marriage." We reject this proposition as without evidential support, and decline to alter the judge's findings and conclusions.

Plaintiff lastly argues she held an entitlement to refunds resulting from the parties' joint 2009 state and federal tax returns. During the post-judgment reconsideration motions, defendant sought retention of the refund because plaintiff had no taxable income. The judge agreed. On appeal, plaintiff suggests defendant's proofs were insufficient to support the

result.  We conclude the argument lacks sufficient merit to warrant discussion in our opinion.  R. 2:11-3(e)(1)(E).

### F.

In his cross-appeal, defendant attacks the order to pay plaintiff's counsel fees and challenges the amount of life insurance he was ordered to provide.  We disagree the judge abused his discretion by ordering defendant to satisfy the balance of plaintiff's outstanding attorney's fees and costs. We determine, however, a factual error occurred in the review of the life insurance issue, necessitating reversal and remand.

### 1.

Fees in family actions are normally awarded to permit parties with unequal financial positions to litigate on an equal footing.  A counsel fee award is left to the sound discretion of the trial court, after consideration of the factors identified in Rule 5:3-5(c).  We will disturb a trial court's determination of a counsel fee award "only on the rarest occasions, and then only because of a clear abuse of discretion."  Rendine v. Pantzer, 141 N.J. 292, 317 (1995).

Here, the judge properly and carefully considered all applicable factors and exercised reasonable discretion in ordering defendant to pay the balance of plaintiff's

outstanding counsel fees.  We identify no basis to set aside that order.

2.

The final issue raised in defendant's cross-appeal focuses on his obligation to retain life insurance to secure his support obligations.  See N.J.S.A. 2A:34-25 (providing authority for requiring life insurance as security for an alimony or child support obligation).  The judge denied defendant's motion for reconsideration seeking to annually reduce the amount of insurance designed to guarantee alimony, apparently because he misunderstood the motion.  In denying the motion, the judge stated, "[defendant]'s application that [plaintiff] maintain life insurance in the amount of $500,000 per each of the three children until a child is emancipated misses the fact that he is the dominant income earner and supporting parent."

This issue too is subject to review on remand.  First, defendant's request on reconsideration was not addressed. Second, an allocation of the total amount of life insurance between plaintiff and the children must be made.  The ambiguous requirement that plaintiff be named a beneficiary "to the extent of her interest" cannot stand.

IV.

In summary, we reverse the order of limited duration alimony and remand for consideration of an award of permanent alimony. Regarding this issue, we affirm the calculations fixing the marital lifestyle, except with respect to the issue of savings. The judge must consider plaintiff's budget request and provide specific findings and conclusions on this issue. The determination to impute income to plaintiff is affirmed. However, we reverse as to the commencement of income imputation. On remand, the judge must consider the time and money necessary for plaintiff to update her skills to enable her to obtain employment at the level so imputed. The basic child support amount is affirmed, subject to recompilation in the event of changes in the amount of alimony. Also on remand, the judge must articulate findings and conclusions regarding the nature of the supplemental child support award and must analyze the basis for restriction of a substantial portion of that award. We affirm the determination regarding the 2008 bonus and remand for findings and conclusions on the distribution of the 2007 bonus. We affirm the determination regarding the 2009 income tax refund. On the cross-appeal, we affirm the award of counsel fees. We remand for clarification of defendant's life insurance obligations. The judge must consider defendant's request to

annually reduce the life insurance component securing his alimony obligation and specifically allocate the amount of life insurance between plaintiff and the children.

Affirmed in part, reversed in part, and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3582-10T1