# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0748-23

H.D.,

    Plaintiff-Respondent,

v.

V.P.,

    Defendant-Appellant.

_____

Argued February 26, 2025 – Decided June 11, 2025

Before Judges DeAlmeida and Puglisi.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FV-12-2413-23.

Andrew M. Shaw argued the cause for appellant (Shaw Divorce & Family Law LLC, attorneys; Andrew M. Shaw, on the briefs).

Evan R. Weinstein argued the cause for respondent (Weinstein Family Law, attorneys; Evan R. Weinstein, of counsel and on the brief; Erika P. Handler, on the brief).

PER CURIAM

Defendant V.P.[1] appeals from the July 27, 2023 final restraining order (FRO) entered against him in the Family Part pursuant to the Prevention of Domestic Violence Act (the Act), N.J.S.A. 2C:25-17 to -35, and the October 27, 2023 order awarding attorney's fees to plaintiff H.D.  We affirm.

I.

The parties were married and have two children.  On February 15, 2023, plaintiff filed a complaint in the Family Part seeking a divorce.  During the prior two years, defendant had repeatedly accused plaintiff of having a romantic relationship with his close friend and business partner, B.P.  Plaintiff and B.P. denied the accusations.  Defendant and B.P. were longtime friends and former college roommates who jointly owned and operated several pharmacies.

On April 24, 2023, while the divorce complaint was pending, plaintiff filed a domestic violence complaint and request for a temporary restraining order (TRO) against defendant.  She alleged:  (1) in early April 2023, plaintiff and B.P. received "spoofed" phone calls – calls from an unidentified person that appeared to be coming from plaintiff and B.P. – relating to the alleged affair; (2) on April 11, 2023, plaintiff received fifteen emails from various therapy

---

[1]  We use initials to preserve the confidentiality of court records concerning domestic violence.  R. 1:38-3(d)(9).

2

A-0748-23

groups indicating she and B.P. had been enrolled in marriage counseling although neither had enrolled for counseling; (3) on April 22, 2023, plaintiff's mother received a phone call, which was overheard by plaintiff, from an unknown caller who told plaintiff's mother that what was happening with her daughter was terrible; (4) on April 23, 2023, plaintiff's friend received a phone call from an unknown caller who told her B.P.'s daughter, who was her niece, would be raped; and (5) on April 24, 2023, the parties' daughter received a phone call from defendant while she was in a car with plaintiff. Shortly after the call ended, plaintiff received several text messages and phone calls from an unknown number. The text messages purported to be from a lover wanting to meet plaintiff. Shortly after those calls and messages stopped, defendant again called the daughter from his number. Plaintiff attributed each of the alleged acts to defendant and contended they constituted the predicate acts of harassment, N.J.S.A. 2C:33-4, and cyber harassment, N.J.S.A. 2C:33-4.1(a).

With respect to the parties' history of domestic violence, the complaint alleged that on March 5, 2023, plaintiff was informed defendant launched a website stating his intention to publicize all the documents, evidence, and developments in their pending divorce action. The website stated the divorce was the result of a spouse's infidelity with the close friend of her spouse. In

3

addition, plaintiff alleged defendant violated a consent order imposing civil restraints by sending her harassing messages, including one threatening to kill B.P.[2] Plaintiff also alleged defendant: in October 2020, kicked her in the head when she was pregnant; in March 2022, slapped her across the face at a party; and in November 2022, kicked her in the chin. The court entered the TRO on April 24, 2023.

The court held a three-day trial. On the first day of trial, plaintiff testified to the following facts. She moved out of the marital home in December 2022 due to defendant's constant harassment and her fear of him. Shortly before she filed the April 24, 2023 complaint, a mutual friend of the parties told plaintiff defendant had started a website named "[D.] v. [V.]" to document their divorce proceedings. The website stated, "[t]his is a case of a divorce due to a spouse cheating with another man. The other man was no stranger but the most trusted person to their spouse and family." The website noted it was "built so all the ongoing case documents can be uploaded for anyone who wants an insight into the case" and states viewers can "[s]ubscribe to be the first to know about our

---

[2] In December 2022, plaintiff filed a separate domestic violence complaint and request for a TRO against defendant. That complaint resulted in the entry of a TRO in January 2023. On March 2, 2023, the parties resolved that matter through entry of a consent order imposing civil restraints on defendant.

A-0748-23

launch and request [a] password so you can have access to all evidence related to the case."

When plaintiff viewed the website, she felt scared and harassed. She was upset because the website falsely accused her of having an affair and felt publicly shamed. Plaintiff was also concerned her children would one day access the website. On cross-examination, plaintiff admitted she did not access any links on the website and did not know what documents or evidence were available through the website.

In April 2023, plaintiff received phone calls that were "spoofed" to appear to be coming from B.P. Plaintiff verified with B.P. and his spouse that they had not made the calls. Plaintiff also received a text message from an unknown number while she was working from home stating "thank you for meeting today. I hope it doesn't end like this, it can't end like this." She had not left the home that day. Plaintiff attributed the calls and text message to defendant.

On April 11, 2023, plaintiff received fifteen emails from various therapists indicating she had registered for couple's counseling to rehabilitate her marriage. The registrations were connected to two of plaintiff's email accounts, one of which she rarely used and was known to a limited number of people, including defendant. Some of the emails stated plaintiff and B.P. had registered for

5

couple's counseling together. Plaintiff had not registered for any of the therapy sessions. She believed defendant had registered her and B.P. for the therapy sessions and felt his behavior constituted harassment and invaded her privacy.

On April 22, 2023, plaintiff's mother received a call from an unknown phone number while plaintiff was present. Plaintiff heard the caller tell her mother, "it's so unfortunate what's happened to your daughter." Her mother hung up immediately. The call, which plaintiff viewed as an indirect threat to her safety, made her feel scared. Plaintiff attributed the call to defendant.

On April 24, 2023, plaintiff was driving her daughter to school when the daughter received a call from defendant. Shortly after that call ended, plaintiff received a series of text messages from an unknown number. The messages contained statements such as, "love me until I can't breathe," "f[***] me until I can't take it anymore," "baby, baby you're the one I want forever," "what we had was an amazing affair," "you broke your marriage for the secret we had." Plaintiff attributed the messages, which made her feel scared, to defendant. Defendant again called the parties' daughter immediately after the text messages ceased. After that conversation ended, plaintiff received five phone calls from the unknown number from which the text messages had been sent. Plaintiff attributed the calls to defendant.

6

Plaintiff is fearful of defendant. She stopped working from home because she is afraid to be alone in the house. Plaintiff is in fear of defendant's erratic behavior and concerned he will appear at her home. She believes an FRO is the only thing that will prevent defendant from continuing to harass her and escalating his behavior toward her.

After the parties returned from the lunch break on the first day of trial, plaintiff testified that while she, her sister, B.P., B.P.'s spouse, and her counsel were together finishing their lunch outside the courthouse, defendant approached them. He stood near the group vaping. When plaintiff's counsel informed defendant the TRO precluded him from being so close to plaintiff, defendant said, "I can stand wherever I want, you're crazy." Defendant remained close to plaintiff, causing her to feel threatened and afraid. The court adjourned the trial to permit plaintiff to amend her complaint to include the lunchtime incident as a predicate act of domestic violence.

On June 2, 2023, plaintiff filed an amended domestic violence complaint and request for a TRO against defendant. To her original complaint, plaintiff added allegations describing her lunchtime encounter with defendant outside the

A-0748-23

courthouse and alleging he engaged in the predicate act of contempt of a TRO, N.J.S.A. 2C:29-9(b). A judge signed the amended TRO on June 2, 2023.[3]

When the trial resumed, plaintiff's counsel played a video surveillance recording from outside the courthouse during the lunch break on the first day of trial. The video depicted defendant's interaction with plaintiff, her counsel, and the others who accompanied her to the trial. Plaintiff testified she felt afraid when defendant approached her group and refused to move. She thought that if defendant was willing to approach her while she was accompanied by her counsel at the courthouse, he was capable of doing something worse if she was alone.

Plaintiff testified to the following with respect to the parties' history of domestic violence. In November 2022, defendant told plaintiff he believed she was using medications stolen from his pharmacy to poison him and their children. That night, plaintiff slept with the children apart from defendant. During the night, defendant came into the bedroom where plaintiff and the children were asleep and began humping a pillow near the parties' eighteen-month-old son and saying, "you know, this is what [B.P.] does with his wife.

---

[3] On May 25, 2023, defendant was arrested and charged with violating the TRO. At the time of the trial, the criminal charge against defendant was pending.

And you're always going to be his whore." Plaintiff was terrified. She called defendant's best friend and asked him to intervene. The friend spoke with defendant on the phone and succeeded in calming him, although defendant ended the encounter with plaintiff by telling her he was always watching her.

Plaintiff subsequently asked defendant's parents to move into the marital home because their presence would make her feel safer. Two days before plaintiff moved out of the marital home, defendant spent thirty minutes repeatedly calling her a whore in front of his father. Defendant's father was unable to convince him to stop. This event terrified plaintiff and caused her to move out of the house.

The following day, defendant texted plaintiff demanding access to her PayPal, Venmo, Lyft, and Uber accounts. Although he said he needed access for accounting purposes, plaintiff believed he was searching for evidence of the imagined affair and wanted to monitor her movements and behavior. Defendant had a history of taking her phone and spending hours examining its contents for proof of an affair with B.P. Defendant took screen shots of charts measuring plaintiff's cellphone data usage and then compared peaks in her usage with video recordings of B.P. at the pharmacy to see if B.P. was looking down at his phone when plaintiff had periods of increased use of her phone.

9

Plaintiff's subsequent attempts to block defendant from further electronic communications with her were unsuccessful. He continued to send her text messages blaming her for the deterioration of their marriage. During a video telephone call between plaintiff and their four-year-old daughter, who was at defendant's home, he interrupted by saying repeatedly "I'm going to kill [B.P.] with my bare hands." Defendant's behavior frightened plaintiff and made her concerned for her daughter's safety. As the call ended, defendant said, "mommy has to go now. She has to go talk to [B.P.]" This comment upset the child.

In December 2021, when plaintiff was pregnant with the parties' son, defendant kicked her in the back of the head. This assault happened while plaintiff was driving a car with defendant in the back seat.[4] After arriving home, defendant repeatedly struck himself in the head with a bicycle helmet.

In March 2022, the parties were at a birthday party. B.P. and his wife were also in attendance. When B.P. and his wife were about to leave, defendant slapped plaintiff across the face and told her to give B.P. a proper "goodbye." In November 2022, defendant kicked plaintiff in the chin during an argument.

---

[4] It is not clear if this assault is the same event as the October 2020 assault alleged as a predicate act in the amended complaint.

H.R., who was employed by defendant, testified he was a passenger in defendant's car on the morning of April 24, 2023. H.R., who stated he understood "a little English," and testified through an interpreter, stated that he heard defendant's phone call with his daughter, but did not see or hear defendant make any other phone calls or send text messages during the drive.

Defendant's father also testified. He stated that on April 23, 2023, he, his wife, and defendant picked up the parties' children at plaintiff's home. They arrived at a park at about 4:00 p.m. and stayed for an hour. They then went to a restaurant and, after dinner, brought the children back to plaintiff's home, arriving at about 7:00 p.m. He testified defendant never left his sight that afternoon, except to use the bathroom. He said defendant did not use his phone while they were together and left the phone on the table with his father when he went to the bathroom. He denied ever hearing defendant call plaintiff a whore.

B.P. testified he and defendant were business partners who met as college roommates. In November 2022, defendant accused B.P. of having an affair with plaintiff. B.P. was shocked by the baseless accusation, which he denied. Defendant thereafter repeatedly contacted him, making the same allegation. Defendant began making threatening statements, including, "I hope you die," "I'm going to pull your eyeballs out and feed them to the pigeons," "I'll remind

11

you every day of the sh[***]y person you are," and "I will make you feel the pain I'm feeling now one day." This behavior strained their business relationship and B.P. initiated the sale of his interest in the business to get away from defendant. In April 2023, someone listed B.P.'s home for sale with a real estate agent with the notation "[h]aving an affair with my best friend's wife, need to sell it quick." B.P. attributed that act to defendant.

Defendant also testified. He denied sending text messages and telephone calls to plaintiff on April 24, 2023, while she was in the car with their daughter. He also denied having made the April 23, 2023 call regarding B.P.'s daughter and calling plaintiff's mother on April 22, 2023. Finally, defendant denied having registered plaintiff or B.P. for marital counseling sessions.

Defendant admitted creating the website dedicated to the parties' pending divorce action. He testified he did so because he "was pissed off at the decisions" plaintiff made and said "she's going to live with" those decisions. Defendant noted his First Amendment right to make public statements about a matter with which he was concerned.

With respect to the history of domestic violence, defendant denied kicking plaintiff in the head. He admitted having an argument with plaintiff at the party,

A-0748-23

but denied striking her. Defendant also denied kicking plaintiff in the chin and saying he would kill B.P. in front of the parties' child during a video phone call.

Defendant denied having seen plaintiff sitting outside the courthouse during the lunch break on the first day of trial. He said she was surrounded by counsel and the people who attended the trial with her. Defendant denied having the intention of intimidating plaintiff, claimed he was fifty feet from her while he was vaping in the designated smoking area, and that he was not aware standing near plaintiff was a violation of the TRO. He testified he spent less than two minutes standing near plaintiff.

On July 27, 2023, the court issued an oral opinion granting the FRO. The court found plaintiff's testimony to be "highly credible" and that "[s]he was clear, direct[,] . . . [a]t times emotional[, b]ut not inappropriately so." However, the court found "there were a couple times . . . most notably the contempt of the [TRO] testimony, where she testified she was fearful of that encounter" that she exaggerated. "Other than that," the court found "her to be credible and believable, and she just wanted this to stop."

The court found defendant to lack credibility. The court noted defendant "gloss[ed] over" his testimony about the website and that his general denials with respect to the predicate acts and history of domestic violence were

A-0748-23

unconvincing. The court found "[i]t's clear that he could not take no for an answer. I don't think the defendant was ever smug . . . with . . . the [c]ourt. But he clearly had some self[-]control issues." The court noted during defendant's testimony his counsel and the court "had difficulty controlling him . . . ."

The court also found H.R.'s testimony unconvincing. The court questioned why his routine ride to work on April 24, 2023 "would have been so striking to him that he remembers that day" and noted defendant was not with him every moment that morning, giving defendant an opportunity to call and text message plaintiff. In addition, the court noted H.R. "probably has a sense of loyalty [to defendant and t]hat his job may be dependent upon providing supporting testimony. . . . I don't think any alibi was established by [H.R.]."

The court made similar findings with respect to defendant's father. The court questioned why the events of April 23, 2023 would stand out to him to the point that months later he was certain defendant was in his presence every moment during a multi-hour visit with his grandchildren. The court concluded, "[t]hat's not believable. And again, I don't think an alibi is established."

With respect to the alleged predicate acts, the court rejected plaintiff's allegation defendant was in contempt of the TRO during the lunch break encounter outside the courthouse. The court found defendant stood in the

14

designated smoking area to vape at the only entrance open to the public and remained approximately forty feet from plaintiff. The court found defendant did not initiate contact with plaintiff, who was surrounded by her friends and her counsel, and that plaintiff was not likely to have been legitimately frightened.

The court also found defendant did not commit the predicate act of cyber harassment. Noting the statutory elements of the offense, the court found defendant did not use an electronic device to threaten to inflict injury or harm on plaintiff, send her lewd, indecent, or obscene material, or threaten to commit a crime against her. See N.J.S.A. 2C:33-4.1.

However, the court concluded defendant committed the predicate act of harassment on three occasions: (1) on April 11, 2023, when he registered plaintiff and B.P. for marriage counseling; (2) on April 22, 2023, when he called plaintiff's mother and made the statement about which plaintiff testified; and (3) on April 24, 2023, when he sent plaintiff texts and phone calls while she was driving with her daughter. The court rejected defendant's argument that:

> it is utter coincidence that out of the blue the plaintiff got communications from marriage counselors and therapists and was signed up for sessions about cheating, about extramarital affairs, about keeping a marriage together. And that just by pure coincidence again, [B.P.] gets one as well.
>
> . . . .

15

I think more likely than not . . . these [fifteen] emails about therapy and marriage counseling groups and signing them up for cheaters anonymous or whatever it is, they were sent by the defendant. They weren't sent by accident.

I'm not willing to believe that the plaintiff sent them to herself, as part of some grand conspiracy plan.

The same way that the mother receives a phone call from a disguised voice speaking about the very lurid details that were presented in this case, I don't think is a coincidence.

And the fact that anonymous texts were received by the plaintiff, within seconds or a minute of concluding a phone call with the parties' daughter, when the defendant knew that the daughter was in the car, I'm just not convinced. It's not a coincidence.

The court found "defendant's jealousy filled rage . . . led him to . . . this barrage of harassing behavior, for which he would not take no, he would not stop, I think that's what the [c]ourt was witness to over three days of testimony." In addition, the court found "[t]he idea of a conspiracy theory that the plaintiff and the family friend have worked together to try to undo and undercut the defendant, is too attenuated and too complex" to be credible.

With respect to the parties' history of domestic violence, the court found defendant created the website and, although he may have a First Amendment right to publicize his divorce proceedings,

16

[t]his was not a website launch which was informational. It was not a how to guide on how to get through a divorce. It was not designed to educate and inform the public on what to expect in a divorce proceeding or how to deal with the fallout. The purpose of the website was to embarrass, was to harass, which was to out the plaintiff. It was to denigrate her. It was to accuse her. It invited subscriptions by others which would include family members, friends, acquaintances and others that would know them.

It did not serve any informational purpose. It served the purpose of, and with the intent to, annoy, alarm and harass the plaintiff. Now this is three days after the civil restraints agreement.

So I considered that . . . as a piece of prior history and not as a predicate act . . . .[5]

The court found plaintiff was "concerned, I think she was fearful, I think she was filled with anxiety" and that entry of an FRO was warranted. The July 27, 2023 FRO memorialized the trial court's decision.

Plaintiff thereafter applied for attorney's fees. On October 27, 2023, the court entered an order granting plaintiff $18,904 in attorney's fees.[6]

---

[5] The court did not make findings of fact with respect to the other acts plaintiff alleged were part of the parties' history of domestic violence.

[6] Although the body of the order is dated September 15, 2023, it was filed on October 27, 2023.

This appeal followed. Defendant argues: (1) the trial court's consideration of the website as part of the parties' history of domestic violence for purposes of issuing an FRO is precluded by the First Amendment and State v. Burkert, 231 N.J. 257 (2017); (2) the trial court's conclusion defendant engaged in the predicate act of harassment is not supported by sufficient evidence; and (3) because the FRO is invalid, the award of attorney's fees must be reversed.

Plaintiff argues we lack jurisdiction to hear defendant's appeal because it was not filed within forty-five days of entry of the July 27, 2023 FRO. See R. 2:4-1(a).

II.

A.     Appellate Jurisdiction.

We begin with plaintiff's jurisdictional challenge to defendant's appeal. Under Rule 2:2-3(a)(1), an appeal as of right may be taken to this court only from a "final judgment" of the trial court. "To be a final judgment, an order generally must 'dispose of all claims against all parties.'" Janicky v. Point Bay Fuel, Inc., 396 N.J. Super. 545, 549-50 (App. Div. 2007) (quoting S.N. Golden Estates, Inc. v. Cont'l Cas. Co., 317 N.J. Super. 82, 87 (App. Div. 1998)). "This rule, commonly referred to as the final judgment rule, reflects the view that

'piecemeal [appellate] reviews, ordinarily, are [an] anathema to our practice.'" Id. at 550. (quoting S.N. Golden Estates, Inc., 317 N.J. Super. at 87) (internal quotation marks omitted).

"An order is interlocutory, and not final, if it does not dispose of counsel fees issues." N.J. Mfrs. Ins. Co. v. Prestige Health Grp., LLC, 406 N.J. Super. 354, 358 (App. Div. 2009); see also Marx v. Friendly Ice Cream Corp., 380 N.J. Super. 302, 305 n.3 (App. Div. 2005); Sprenger v. Trout, 375 N.J. Super. 120, 125 (App. Div. 2005); Shimm v. Toys From The Attic, Inc., 375 N.J. Super. 300, 304 (App. Div. 2005).

The July 27, 2023 FRO was, therefore, interlocutory. The forty-five-day period in which to file an appeal began with the entry of the October 27, 2023 order awarding plaintiff attorney's fees. See R. 2:4-1(a). Defendant's November 10, 2023 notice of appeal was timely filed.

B.    Predicate Acts of Harassment.

"In our review of a trial court's order entered following trial in a domestic violence matter, we grant substantial deference to the trial court's findings of fact and the legal conclusions based upon those findings." D.N. v. K.M., 429 N.J. Super. 592, 596 (App. Div. 2013) (citing Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)).  We should not disturb the "factual findings and legal

conclusions of the trial judge unless [we are] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Cesare, 154 N.J. at 412 (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co., 65 N.J. 474, 484 (1974)). Deference is particularly appropriate when the evidence is testimonial and involves credibility issues because the judge who observes the witnesses and hears the testimony has a perspective the reviewing court does not enjoy. Pascale v. Pascale, 113 N.J. 20, 33 (1988) (citing Gallo v. Gallo, 66 N.J. Super. 1, 5 (App. Div. 1961)).

The entry of an FRO requires the trial court to make certain findings. See Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006). The court "must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19[(a)] has occurred." Id. at 125. The court should make this determination "in light of the previous history of violence between the parties." Ibid. (quoting Cesare, 154 N.J. at 402).

Next, the court must determine "whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29[(a)](1) to -29[(a)](6), to protect the victim from an immediate danger or to prevent further

20

abuse." Id. at 127 (citing N.J.S.A. 2C:25-29(b)); see also J.D. v. M.D.F., 207 N.J. 458, 475-76 (2011). This determination requires evaluation of:

> (1) The previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse;
>
> (2) The existence of immediate danger to person or property;
>
> (3) The financial circumstances of the plaintiff and defendant;
>
> (4) The best interests of the victim and any child;
>
> (5) In determining custody and parenting time the protection of the victim's safety; and
>
> (6) The existence of a verifiable order of protection from another jurisdiction . . . .
>
> [N.J.S.A. 2C:25-29(a); see also Cesare, 154 N.J. at 401.]

Here, the trial court found defendant committed harassment, one of the predicate acts set forth in the Act, on three occasions. N.J.S.A. 2C:25-19(a)(13). A person commits harassment if, "with purpose to harass another," he or she:

> (a) Makes, or causes to be made, one or more communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;
>
> (b) Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or

21

(c)  Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

[N.J.S.A. 2C:33-4.]

For a finding of harassment under N.J.S.A. 2C:33-4, the actor must have the purpose to harass. Corrente v. Corrente, 281 N.J. Super. 243, 249 (App. Div. 1995) (citing D.C. v. T.H., 269 N.J. Super. 458, 461-62 (App. Div. 1994); E.K. v. G.K., 241 N.J. Super. 567, 570 (App. Div. 1990)). Finding a party had the purpose to harass must be supported by "some evidence that the actor's conscious object was to alarm or annoy; mere awareness that someone might be alarmed or annoyed is insufficient." J.D., 207 N.J. at 487 (citing State v. Fuchs, 230 N.J. Super. 420, 428 (App. Div. 1989)). A purpose to harass may be inferred from the evidence. State v. McDougald, 120 N.J. 523, 566-67 (1990). Common sense and experience may also inform a determination or finding of purpose. State v. Hoffman, 149 N.J. 564, 577 (1997) (citing State v. Richards, 155 N.J. Super. 106, 118 (App. Div. 1978)). "[T]he decision about whether a particular series of events rises to the level of harassment or not is fact-sensitive." J.D., 207 N.J. at 484.

Defendant argues the record contains no direct evidence he made the phone calls and sent the text messages that underlie the April 22, 2023, and April

23, 2023 predicate acts. In addition, he argues the record contains no direct evidence linking him to the registration of plaintiff and B.P. for counseling.

We have reviewed the record and conclude it contains sufficient evidence supporting the trial court's determination that defendant committed three predicate acts of harassment. While plaintiff's evidence of defendant's connection to the phone calls, text messages, and other harassing acts is largely circumstantial, it is also highly persuasive. As the trial court found, a remarkable number of coincidences would have had to occur if someone other than defendant was responsible for the harassing acts. In addition, as is discussed below, defendant's admitted creation of the website supports the court's conclusion he was responsible for the harassing phone calls, text messages, and counseling enrollment. The trial court, having had the benefit of seeing and hearing the witnesses testify, rejected defendant's argument plaintiff and B.P. called and texted themselves to damage defendant. There is no basis on which to disturb the trial court's findings.

C.   The Parties' History of Domestic Violence.

Defendant argues the website he created is constitutionally protected speech that cannot be considered a prior act of domestic violence supporting the

entry of an FRO. Defendant's reliance on the holding in <u>Burkert</u> in support of this argument is misplaced.

<u>Burkert</u>, a county corrections officer, created flyers which contained a fellow officer's wedding photograph. 231 N.J. at 265. He altered the photograph to include lewd comments insulting both the fellow officer and his wife as retaliation for comments the wife posted online. <u>Ibid.</u> Burkert circulated flyers with the altered photograph at the county correctional facility where the two officers worked. <u>Id.</u> at 262-63, 265-66. The officer depicted in the photograph filed a criminal complaint against Burkert alleging harassment, N.J.S.A. 2C:33-4(c). <u>Id.</u> at 266.

A municipal court convicted Burkert of harassment. <u>Id.</u> at 267. The court found the language he added to the photograph was lewd and obnoxious and would seriously annoy any person, justifying the conviction. <u>Id.</u> at 267-68. The Law Division affirmed. <u>Id.</u> at 268. That court found Burkert circulated the flyers with the purpose to harass the other officer by seriously annoying him. <u>Ibid.</u>

We reversed, holding that "the commentary [Burkert] added to the [other officer's] wedding photograph was constitutionally protected speech." <u>State v. Burkert</u>, 444 N.J. Super. 591, 594 (App. Div. 2016). We accepted the argument

that the photograph was not directed at the other officer, but to an audience of possible willing listeners including other corrections officers. Id. at 601-03. In addition, we found the record contained insufficient evidence Burkert intended to alarm or seriously annoy the other officer or invade his privacy by circulating the flyers. Ibid.

The Supreme Court affirmed. 231 N.J. at 263. After considering precedents interpreting the First Amendment and the legislative intent when adopting N.J.S.A. 2C:33-4(c), the Court held:

> [F]or constitutional reasons, we will construe the terms "any other course of alarming conduct" and "acts with purpose to alarm or seriously annoy" [in N.J.S.A. 2C:33-4(c)] as repeated communications directed at a person that reasonably put that person in fear for his safety or security or that intolerably interfere with that person's reasonable expectation of privacy. . . .
>
> To be clear, the standard set forth above applies only in those cases where the alleged harassing conduct is based on pure expressive activity.
>
> . . . .
>
> Subsection (c) was never intended to protect against the common stresses, shock, and insults of life that come from exposure to crude remarks and offensive expressions, teasing and rumor mongering, and general inappropriate behavior. The aim of subsection (c) is not to enforce a code of civil behavior or proper manners.
>
> [Id. at 284-85.]

Applying this standard, the Court concluded Burkert could not be criminally prosecuted for his behavior:

> Even assuming that the circulation of the flyers constituted a course of conduct or repetitive acts, the State did not present sufficient evidence to support a conviction under N.J.S.A. 2C:33-4(c). The flyers were intended to and did humiliate [the other officer]. The flyers, however, did not threaten or menace him. Nothing in the record suggests that [the other officer's] safety or security were put at risk by the flyers or that any inmates got ahold of them.
>
> The record, moreover, does not establish that Burkert had repeated unwanted communications with [the other officer].
>
> . . . .
>
> The facts in this case – even when viewed in the light most favorable to the State – do not satisfy the elements necessary for a subsection (c) violation of the harassment statute.
>
> [Id. at 286-87.]

Notably, the Court held its conclusion that Burkert could not be criminally sanctioned for circulating the flyers "does not foreclose other potential remedies or sanctions for the behavior at issue in this case. Indeed, workplace discipline was imposed on Burkert, and [the other officer] filed a civil action." Id. at 287.

Here, defendant was not criminally sanctioned for creating the website. Burkert, therefore, is not directly on point. Nor did the court find creation of

26

the website to be a predicate act of domestic violence. Thus, entry of the FRO was not predicated on defendant's creation of the website.

Instead, creation of the website, which arguably is substantively similar to the circulation of the flyers in Burkert, was found by the trial court to be an element of the parties' domestic violence history. The court considered the website to be evidence of defendant's intent to annoy and alarm plaintiff – an intention he carried out with subsequent communications on three occasions the court found to be predicate acts of harassment. We do not view Burkert to preclude a court in a domestic violence trial from considering conduct that is arguably protected by the First Amendment as evidence of a defendant's intent when the defendant engaged in subsequent harassing behavior. Defendant's creation of the website, unlike the circulation of the flyers in Burkert, was closely followed by acts of harassment that put plaintiff in fear for her safety and security. The creation of the website shed light on defendant's intent when he committed those acts.

In addition, even if the court was precluded from considering defendant's creation of the website as an element of the parties' history of domestic violence, reversal of the FRO is not warranted. The court found defendant engaged in three predicate acts of harassment after creation of the website, one in the

27

presence of his four-year-old daughter. Those acts alone are sufficient to warrant entry of the FRO.

D.    Attorney's Fees Award.

As compensation for a victim of domestic violence, a trial court may award reasonable attorney's fees. N.J.S.A. 2C:25-29(b)(4). A counsel fee award is left to the sound discretion of the trial court and is disturbed only on the rarest occasions. Gnall v. Gnall, 432 N.J. Super. 129, 165 (App. Div. 2013). "[D]eterminations by trial courts [regarding legal fees] will be disturbed only on the rarest of occasions, and then only because of a clear abuse of discretion." McGowan v. O'Rourke, 391 N.J. Super. 502, 508 (App. Div. 2007) (second alteration in original) (quoting Packard-Bamberger & Co. v. Collier, 167 N.J. 427, 444 (2001)); accord Rendine v. Pantzer, 141 N.J. 292, 317 (1995).

We reviewed the record and find no basis on which to disturb the trial court's October 27, 2023 order awarding plaintiff attorney's fees. The court's written decision succinctly explains the basis for the award, which is supported by the record.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

28                                                                        A-0748-23