**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0829-24

S.S.,[1]

    Plaintiff-Respondent,

v.

A.T.S., JR.,

    Defendant-Appellant.

_____

        Submitted November 5, 2025 – Decided November 25, 2025

        Before Judges Firko and Vinci.

        On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FM-12-1204-24.

        Gebhardt & Kiefer, PC, attorneys for appellant (William J. Rudnik, on the brief).

        Respondent has not filed a brief.

PER CURIAM

---

[1]  We use initials to protect records of family part proceedings and medical, psychiatric, psychological, and alcohol and drug dependency records, reports, and evaluations.  R. 1:38-3(a) and (d).

Defendant A.T.S., Jr. appeals from an October 4, 2024 dual final judgment of divorce, contending the court improperly awarded plaintiff S.S. open durational alimony in the amount of $750 per month and $12,000 in counsel fees and costs. We affirm in part and reverse and remand in part.

I.

On April 3, 2023, defendant filed a complaint for divorce. In October 2023, that complaint was dismissed by the court for failure to prosecute because it was never served. On November 28, 2023, plaintiff instituted this action by filing a complaint for divorce.

On July 19, 2024, the court granted plaintiff's application for pendente lite support in the amount of $1,300 per month. At the time, plaintiff earned $49,275 per year. The court noted defendant previously earned $94,348.70 per year but was unemployed at the time of plaintiff's application and was receiving unemployment benefits in the amount of $3,416 per month. In support of the application, plaintiff "list[ed] Schedule A shelter expenses at $2[,]170 total. Schedule B transportation expenses . . . at $2,779 total. Schedule C personal expenses . . . at $3,458." "The grand total of these expenses [was] $8,407 monthly."

A-0829-24

On the day of trial, the parties entered into a stipulation of settlement resolving all issues other than plaintiff's demand for open durational alimony and counsel fees and costs. They agreed: (1) the marital home would be sold and the proceeds divided equally; (2) their 401(k) accounts and defendant's employee stock options plan would be divided by qualified domestic relations order; and (3) they would keep their own automobiles, bank accounts, and debt in their own names.

The court conducted a trial on September 18, 2024. The parties, who were both represented by counsel, testified and each admitted a case information statement (CIS) as evidence without objection.

We summarize the evidence adduced at trial. The parties were married on June 8, 2003, and have no children. They purchased a home together in South Plainfield in 2009. In 2013, defendant obtained a temporary restraining order against plaintiff, which was dismissed after the parties agreed to the entry of civil restraints. The parties subsequently reconciled and lived together in the marital home until May 2015, when defendant moved out.

The parties maintained a joint bank account until they were divorced. Prior to the separation, both parties deposited their paychecks into the joint account, and all bills were paid from that account. After they separated,

defendant deposited half of their mortgage payment into the joint account each month until March 2024 when he became unemployed.

Plaintiff testified she works full-time as an office assistant and earns "about $49,000 a year." Her CIS listed joint lifestyle expenses in the total amount of $9,625 per month, including: Schedule A: shelter expenses of $3,585 per month; Schedule B: transportation expenses of $1,650 per month; and Schedule C: personal expenses of $4,390 per month. Plaintiff testified she incorrectly listed the amount of a car loan payment on her CIS and the parties' "standard of living" prior to the separation was approximately $9,300.

Plaintiff's "current" standard of living at the time of trial "for shelter, transportation[,] and personal [was] $4,383." According to her CIS, this included: Schedule A: shelter expenses of $2,354 per month; Schedule B: transportation expenses of $425 per month; and Schedule C: personal expenses of $1,604 per month.

In 2013, plaintiff entered an in-patient facility "for recovery from alcohol." The parties reconciled after she completed treatment and lived together until defendant "left in May 2015, accusing [her] of cheating." She did not "feel like the marriage had ended at that point" "[b]ecause [they] . . . continued to see each other on a regular basis."

A-0829-24

"At one point, [defendant] came over every day after work to have drinks, have cocktails, do yardwork, [and] fix faucets." They had sexual relations in "the summer of 2020, 2021." Plaintiff felt they "were in an exclusive relationship" as she "was[ not] seeing anyone else." Defendant would "come . . . and stay for days and weeks. . . . His friends would come over. [They] looked like a couple on the outside."

Plaintiff "had brain surgery in 2019" and "was home all of 2020 . . . healing and COVID[-19] hit." She "suffer[s] from a vitamin deficiency, which cause[s] [her] to have neuropathy in both [her] hands and . . . feet." She needs to "get infusions and injections about once a month . . . because [her] blood cells do[ not] function." The condition causes "[n]umbness and tingling in [her] feet" and she cannot "stand long" and uses "a cane to get around" and "a walker at home." She cannot "go out and get a [second] part-time job . . . because [she] cannot stand for a very long time."

Plaintiff testified their mortgage was in default because defendant stopped contributing his half of the mortgage payment. Plaintiff "ha[d] the money to pay the mortgage and . . . would have paid the mortgage had [defendant] given [her] his half of the mortgage." According to plaintiff, the marital home is worth approximately $500,000 and the outstanding mortgage amount is approximately

A-0829-24

$256,000. Plaintiff paid her counsel $5,000 and owed him "[p]robably about $15,000" at the time of trial. She had two credit cards with a total outstanding balance of approximately $4,000.

Plaintiff was actively searching for an apartment to rent. Based on her search, apartments cost "[a]nywhere from [$]2,100 to [$]2,300" per month "in . . . the Middlesex County area." She "applied to three different apartments" but her applications were "rejected because of lack of income and [her] credit score is below . . . 600" because their mortgage is in default.

Defendant testified he worked for a large retailer for twenty years until March 26, 2024, when he was terminated. At the time of his termination, he was a district manager. "[I]n that final position, [he] was projected to make $92,000 a year in 2024" including "[his] [managers incentive plan] bonus that [he] was supposed to get." His "base salary was [$]88,000." Defendant was offered a severance package, which he refused because it "would prohibit [him] from taking any legal action" against his former employer.

Defendant "searched online on multiple websites" for a new job "that [he] can do remotely because [he]" did "not have an operable car." "So it kind of limit[ed] [him] to exactly how much [he] can do" and "limit[ed] the opportunities that [were] available to [him], considering the salary that [he] was

6

making" when he was terminated. He could not identify any companies he applied to "off the top of [his] head." He received his last unemployment check in September 2024.

According to defendant, his health was "decent." He was "in the process of working on" starting his own "home improvement and property management business[,]" but he was not licensed or certified to do that and did not "actually have the capital to get started." The only thing that stopped him from "getting a job comparable to" his last position was that he did "not have transportation." He believed he could obtain a comparable position if he had transportation. Defendant testified he did not consider other positions because "some people are meant to do menial work. [He is] not one of those people." Instead, he was "looking for suitable employment . . . comparable employment to what [he] left."

Defendant "would[ not] say" the parties were "married for over [twenty] years" because "[they] separated a few different times" and "the final separation occurred in May of 2015." According to defendant, he left at that time because plaintiff "went away for the weekend, did[ not] let [him] know her whereabouts . . . [and] came home Monday as if nothing happened. And that was enough for [him]."

7

The parties had not "done anything that a married couple would do . . . since [he] left home in 2015." Defendant denied engaging in sexual relations with plaintiff since then and denied staying at the marital home more than "one or two nights" after he moved out. The "last time [he] was able to contribute to the mortgage" was in March 2024.

Defendant testified his car loan was in default and he would "need to pay $2,280.12 in order to make the loan current." He took out a loan to pay for "automobile repairs . . . as well as allow [him] a little breathing room" with a current balance of $16,635.87. He had two other outstanding loans with balances of $8,263.34 and "maybe $2,500[,]" as well as four credit cards with outstanding balances totaling approximately $17,000. He lived with his parents since 2015 and paid them $800 per month in rent until "the last three months because [he] just [did not] have the funds."

Defendant believed the martial home was worth $565,000. His CIS listed total current lifestyle expenses of $6,971. They included: Schedule A: shelter expenses of $808 per month; Schedule B: transportation expenses of $3,134 per month; and Schedule C: personal expenses of $3,029 per month. Defendant conceded certain entries were incorrect but agreed his total current lifestyle expenses totaled at least $6,971 per month. Defendant listed total joint lifestyle

8

expenses of $8,407. They included: Schedule A: shelter expenses of $2,170 per month; Schedule B: transportation expenses of $2,779 per month; and Schedule C: personal expenses of $3,458 per month.

At the conclusion of the trial, plaintiff's counsel advised the court he would "provide . . . a certification of services as to [his] entire counsel fee award."

## II.

On October 4, 2024, the court entered the dual final judgment of divorce supported by a written opinion. The court found "plaintiff to be extremely credible." It concluded plaintiff's "positions taken were reasonable and those positions made clear that trial was made necessary by . . . defendant."

The court found defendant was "less than credible." It determined "much of his testimony was based upon unsubstantiated allegations and opinions not grounded in fact or law." His "theory of the case and testimony were not legally sustainable" and "[a]s such, plaintiff incurred extensive legal fees." The court concluded defendant "was unable to produce competent proof of his damages claim or defenses."

A-0829-24

The court applied the factors enumerated in N.J.S.A. 2A:34-23(b).[2] It determined, "[b]ased predominantly upon [f]actors [one through six], [thirteen and fourteen]" it was "inclined to make an open durational alimony award of $750 per month payable by defendant to plaintiff."

As to factor one, the actual need and ability of the parties to pay, the court found plaintiff "earns approximately $50,000 per year." It determined "defendant has always been employed as a district manager for a national home improvements chain and despite being recently unemployed[,] was able to earn $90,000 per year." The court concluded "[p]laintiff has a clear need and

---

[2] Those factors are: (1) The actual need and ability of the parties to pay; (2) The duration of the marriage . . . ; (3) The age, physical and emotional health of the parties; (4) The standard of living established in the marriage . . . and the likelihood that each party can maintain a reasonably comparable standard of living . . . ; (5) The earning capacities, educational levels, vocational skills, and employability of the parties; (6) The length of absence from the job market of the party seeking maintenance; (7) The parental responsibilities for the children; (8) The time and expense necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment . . . ; (9) The history of the financial or non-financial contributions to the marriage . . . by each party . . . ; (10) The equitable distribution of property ordered and any payments on equitable distribution, directly or indirectly, out of current income, to the extent this consideration is reasonable, just and fair; (11) The income available to either party through investment[s] . . . ; (12) The tax treatment and consequences to both parties of any alimony award . . . , [and]; (13) The nature, amount, and length of pendente lite support paid, if any. N.J.S.A. 2A:34-23(b)(1)-(13).

A-0829-24

defendant had an ability to pay alimony. Defendant has been burdened by his own choices which relate to his recent unemployment."

Relevant to factor two, duration of the marriage, the court noted "[t]he parties were married for twenty [and] one-half . . . years." Applying factor three, the age, physical and emotional health of the parties, the court determined plaintiff was forty-six years old and "testified to having had brain surgery in 2019 as well as an on-going vitamin deficiency and neuropathy" and "continue[d] to need treatment." "Defendant [was forty-seven] and appear[ed] to be in good health."

With respect to factor four, the standard of living established in the marriage and the likelihood that each party can maintain a reasonably comparable standard of living, the court determined "[t]he parties seem to have established a solid middle-class lifestyle which required about $9,700 per month to maintain." In support of that finding, the court stated:

> The parties dined out frequently, maintained their split-level home in South Plainfield, enjoyed the purchase of new and expensive clothing on a monthly basis. Plaintiff's CIS went largely unchallenged. Defendant's CIS revealed some misunderstandings[,] which defendant corrected through testimony.

As to factor five, the earning capacities, educational levels, vocational skills, and employability of the partes, the court found plaintiff "earns

A-0829-24

approximately $50,000 per year" and is "earning to full capacity."  Defendant "was projected to earn $92,000 in 2024[,] but was earning $90,000" when he was terminated.  The court found:

> [Defendant] was offered a severance package which was estimated to be $41,000.  Defendant has [not] accepted the severance package, has [not] instituted suit or even retained counsel.  He testified that unemployment benefits [had] run out and that "he will [not] work jobs that are beneath him."  His efforts to find suitable substitute work are confined to search engines on the internet.  He has [not] engaged a "headhunter" or in networking.  He desires to start a home improvement business but at present that is simply speculation.  When pressed about the names of where he applied or interviewed, he was unable to name one company or opportunity.

The court found factor six, the length and absence from the job market of the party seeking maintenance, was "[n]ot relevant as it relate[d] to the plaintiff" and "defendant ha[d] been absent from the workplace since April of 2024."

As to factor thirteen, the nature, amount, and length of pendente lite support paid, the court noted "[d]efendant was ordered to pay plaintiff pendente lite support" in the amount of "$1,300 per month retroactive to June 2024."  It found "[d]efendant failed or refused to make any . . . support payments[,] despite the court order."

12

Applying factor fourteen, other factors which the court may deem relevant, the court found defendant was "voluntarily unemployed" and refused to "accept a $41,000 severance[,]" "actively look for comparable work[,]" or "do work that he deems to be 'beneath him.'"

The court analyzed the factors set forth in <u>Rule</u> 5:3-5(c) and granted plaintiff's request for counsel fees and costs. It found defendant's earning potential was "almost twice the plaintiffs" and defendant's positions in the litigation were not reasonable and his "theories [were] not supported by the facts or by the law." It found plaintiff paid her lawyer $5,000 and owed $15,000, while "[d]efendant's costs and fees were not the subject of his testimony."

The court found "[t]he fees incurred by plaintiff [were] considerable, but not unreasonable considering the time and labor that was necessary to litigate this matter to conclusion," and "[t]he rates charged by plaintiff's counsel are reasonable considering his experience." It determined "[d]efendant's stubbornness and refusal to negotiate in good faith necessitated the commencement of trial and the last [four] months of the case." The court awarded counsel fees and costs "in the amount of $12,000 (of the $20,000 sought) in recognition of the last several invoices that she had to pay which . . . correspond with the timeframes upon which . . . defendant appears to

13

have been disinclined to work to resolve the issues in the case."  This appeal followed.

### III.

On appeal, defendant argues "considering the length of the marital lifestyle, term alimony should have been awarded."  Specifically, that "[t]he parties were married just under twelve . . . years before separating" in 2015.  Alternatively, he contends the end of the marriage should be determined based on the filing of his complaint for divorce on April 3, 2023, not by the complaint filed by plaintiff in this case.

Defendant also argues "[t]he [c]ourt misapplied the statutory factors under N.J.S.A. 2A:34-23" and "the analysis should result in limited duration alimony . . . and an amount less than $750 per month."  He contends the court: (1) failed to "consider [his] substantial debt in regard to his ability to pay" or "analyze plaintiff's actual need for alimony;" (2) incorrectly imputed income and "should have imputed $83,633.72 as that was his income from his last year of employment;" and (3) failed to consider the equitable distribution of property and the anticipated sale of the marital home.

Lastly, defendant contends "there was no basis to award" counsel fees and costs.  Defendant argues, without citation to competent evidence in the record,

plaintiff's counsel "was to provide a certification of services . . . , but one was never provided."[3] He also contends that an award of counsel fees and costs was not warranted based on "[a]n analysis of the specific factors in the court rules."

IV.

Our scope of review of Family Part orders is limited. Cesare v. Cesare, 154 N.J. 394, 411 (1998). "Appellate courts accord particular deference to the Family Part because of its 'special jurisdiction and expertise' in family matters." Harte v. Hand, 433 N.J. Super. 457, 461 (App. Div. 2013) (quoting Cesare, 154 N.J. at 412). "We review questions of law, including the issue of statutory interpretation, de novo." Amzler v. Amzler, 463 N.J. Super. 187, 197 (App. Div. 2020).

We accord the judge's factual findings after a bench trial substantial deference when "'supported by adequate, substantial, credible evidence' in the record." Landers v. Landers, 444 N.J. Super. 315, 319 (App. Div. 2016) (quoting Gnall v. Gnall, 222 N.J. 414, 428 (2015)). "We defer to the credibility determinations made by the trial court because the trial judge 'hears the case, sees and observes the witnesses, and hears them testify,' affording it 'a better

---

[3] Defendant's appellate counsel did not represent him at trial.

perspective than a reviewing court in evaluating the veracity of a witness.'" Gnall, 222 N.J. at 428 (quoting Cesare, 154 N.J. at 412).

A.

Open Durational Alimony

We are satisfied the court did not misapply its discretion by awarding open durational alimony. Pursuant to N.J.S.A. 2A:34-23(b), courts are permitted to "award one or more of the following types of alimony: open durational alimony; rehabilitative alimony; limited duration alimony[,] or reimbursement alimony to either party" after considering the non-exhaustive list of enumerated factors. Open durational alimony is the presumptive award for lengthy marriages. See Gonzalez-Posse v. Ricciardulli, 410 N.J. Super. 340, 353 (App. Div. 2009).

However, the length of a marriage alone cannot determine alimony. Economic dependence is a "crucial finding" necessary to award alimony. Gnall v. Gnall, 432 N.J. Super. 129, 149 (App. Div. 2013), rev'd on other grounds, 222 N.J. 414 (2015). "'The extent of actual economic dependency, not one's conduct as a cohabitant, must determine the duration of support as well as its amount.'" Reese v. Weis, 430 N.J. Super. 552, 571 (App. Div. 2013) (quoting Gayet v. Gayet, 92 N.J. 149, 154 (1983)). Courts must evaluate all the facts when

16

determining whether a claim of economic dependence warrants long-lasting support.  Gnall, 432 N.J. Super. at 153.

Defendant argues the court improperly awarded open durational alimony because the marriage did not "last long[] than twenty . . . years."  We are not persuaded.

Plaintiff testified she did not "feel like the marriage had ended" in 2015 because the parties "continued to see each other on a regular basis."  According to plaintiff, "[a]t one point, [defendant] came over every day after work to have drinks, have cocktails, do yardwork, [and] fix faucets."  She testified they had sexual relations in "the summer of 2020, 2021[,]" and felt "[they] were in an exclusive relationship."  Plaintiff testified defendant would "come . . . and stay for days and weeks. . . . His friends would come over.  [They] looked like a couple on the outside."

The court found plaintiff's testimony credible and defendant's less than credible.  We defer to the court's credibility determinations and do not see any basis to conclude the court misapplied its discretion by determining the term of the marriage was over twenty years.

We are not persuaded by defendant's claim that the court improperly used the date of the filing of the complaint in this case as the filing date of the divorce

17

action. It is well settled that the filing of the divorce complaint is generally used to determine the end of the marriage. See Painter v. Painter, 65 N.J. 196 (1974). We are satisfied the court properly determined the end date of the marriage based on the date plaintiff filed her complaint in this action rather than defendant's earlier dismissed complaint. There is no reason for us to disturb the court's decision to award plaintiff open durational alimony based on the totality of the facts and circumstances of this case.

B.

The Monetary Award

We are convinced the court did not adequately set forth the basis for its determination of the monetary award of alimony. Accordingly, we reverse and vacate that aspect of the October 4, 2024 judgment of divorce and remand for supplemental findings of fact and conclusions of law.

"An alimony award that lacks consideration of the factors set forth in N.J.S.A. 2A:34-23(b) is inadequate." Crews v. Crews, 164 N.J. 11, 26 (2000) (citing N.J.S.A. 2A:34-23(b)(4)). "[F]ailure to consider all of the controlling legal principles requires a remand." Boardman v. Boardman, 314 N.J. Super. 340, 345 (App. Div. 1998).

18

Rule 1:7-4 provides "[t]he court shall, by an opinion or memorandum decision, either written or oral, find the facts and state its conclusions of law thereon . . . on every motion decided by a written order that is appealable as of right." "[A]ppellate review can be impeded when" a trial court fails to "state its factual findings and conclusions of law on the record as required by Rule 1:7-4(a)." Lakhani v. Patel, 479 N.J. Super. 291, 297-98 (App. Div. 2024).

In accordance with the Rule, a "trial [court] is required to 'state clearly its factual findings and correlate them with the relevant legal conclusions.'" Gnall, 222 N.J. at 428 (quoting Curtis v. Finneran, 83 N.J. 563, 570 (1980)). "Naked conclusions do not satisfy the purpose of [Rule] 1:7-4." Rutgers Univ. Student Assembly (RUSA) v. Middlesex Cnty. Bd. of Elections, 438 N.J. Super. 93, 107 (App. Div. 2014) (alteration in original) (quoting Curtis, 83 N.J. at 570).

"The award of spousal support is broadly discretionary." Steneken v. Steneken, 367 N.J. Super. 427, 434 (App. Div. 2004). The court may order alimony "as the circumstances of the parties and the nature of the case shall render fit, reasonable[,] and just." N.J.S.A. 2A:34-23. "[A]limony is neither a punishment for the payor nor a reward for the payee." Mani v. Mani, 183 N.J. 70, 80 (2005). "The basic purpose of alimony is the continuation of the standard of living enjoyed by the parties prior to their separation." Innes v. Innes, 117

N.J. 496, 503 (1990). "[T]he goal of a proper alimony award is to assist the supported spouse in achieving a lifestyle that is reasonably comparable to the one enjoyed while living with the supporting spouse during the marriage." Crews, 164 N.J. at 16.

"In the determination of the marital standard, the court establishes the amount the parties needed during the marriage to maintain their lifestyle." Weishaus v. Weishaus, 180 N.J. 131, 145 (2004); accord S.W. v. G.M., 462 N.J. Super. 522, 532 (App. Div. 2020) ("[A] finding of marital lifestyle must be made by explaining the characteristics of the lifestyle and quantifying it."). "[A] trial judge may calculate the marital lifestyle utilizing the testimony, the CISs required by Rule 5:5-2, expert analysis, if it is available, and other evidence in the record." Ibid.

"The judge is free to accept or reject any portion of the marital lifestyle presented by a party or an expert, or calculate the lifestyle utilizing any combination of the presentations." Ibid. "[O]nce a finding is made concerning the standard of living enjoyed by the parties during the marriage, the court should review the adequacy and reasonableness of the support award against this finding." Crews, 164 N.J. at 26. The establishment of the marital lifestyle is "the touchstone" for the initial alimony award. Id. at 16.

A-0829-24

When imputing income, a trial court must decide whether the circumstances warrant imputation, and if so, must then determine the amount to impute. Ibrahim v. Ibrahim, 402 N.J. Super. 205, 210 (App. Div. 2008). A court can impute income to a party for support purposes when the party is, without just cause, intentionally and voluntarily underemployed or unemployed. Caplan v. Caplan, 182 N.J. 250, 268 (2005); Golian v. Golian, 344 N.J. Super. 337, 341 (App. Div. 2001).

The imputed income figure is one the party is capable of earning. Dorfman v. Dorfman, 315 N.J. Super. 511, 516 (App. Div. 1998). The decision "to impute income of a specified amount will not be overturned unless the underlying findings are inconsistent with or unsupported by competent evidence." Storey v. Storey, 373 N.J. Super. 464, 475 (App. Div. 2004). "Competent evidence includes data on prevailing wages from sources subject to judicial notice." Ibid.

Here, the court determined it was "inclined to make an open durational alimony award of $750 per month." The court, however, did not state clearly its factual findings and relevant legal conclusions to support that award.

Importantly, the court did not explain how it determined "the parties seem to have established a solid middle[-]class lifestyle which required about $9,700

21

per month to maintain." In fact, that finding was not supported by competent evidence in the record. At trial, plaintiff conceded her CIS was incorrect and the joint marital lifestyle required only $9,300 to maintain. Defendant's CIS indicated a lesser amount. The court did not explain how it reached an amount greater than either party claimed.

The court also did not clearly set forth the amount of income it imputed to plaintiff or explain how it determined the amount of imputed income. The court's analysis was limited to finding defendant "was projected to earn $92,000 in 2024[,] but was earning $90,000 at the time of employment separation." The court did not set forth the actual amount of the imputed income, nor did it explain how it determined the amount of imputed income. Imputation of income must be based on "[c]ompetent evidence," including, when appropriate, "data on prevailing wages from sources subject to judicial notice." Storey, 373 N.J. Super. at 475.

Finally, the court did not reconcile the alimony award with the significantly higher pendente lite award it made only a few months prior to trial. On July 26, 2024, the court awarded pendente lite support in the amount of $1,300 per month. The trial was conducted two months later in September 2024 and the court awarded $750 per month in alimony. On remand, the court must

A-0829-24

explain why the final alimony award was significantly lower than the pendente lite award.

In addition to addressing the issues specifically identified in this opinion, on remand the court shall set forth how it considered each of the factors enumerated in N.J.S.A. 2A:34-23(b), state clearly its factual findings, and correlate those findings with the relevant legal conclusions. See Gnall, 222 N.J. at 428.

C.

Attorney Fees

An award of attorney's fees in a matrimonial action rests in the discretion of the Family Part judge. R. 5:3-5(c); Tannen v. Tannen, 416 N.J. Super. 248, 285 (App. Div. 2010) (citing Eaton v. Grau, 368 N.J. Super. 215, 225 (App. Div. 2004)). On appeal, the Family Part judge's decision regarding attorney's fees will be upheld absent a showing of abuse of discretion. Ibid.

In deciding whether to award attorney's fees, the judge should consider:

> (1) the financial circumstances of the parties;
>
> (2) the ability of the parties to pay their own fees or to contribute to the fees of the other party;
>
> (3) the reasonableness and good faith of the positions advanced by the parties both during and prior to trial;

23

(4) the extent of the fees incurred by both parties;

(5) any fees previously awarded;

(6) the amount of fees previously paid to counsel by each party;

(7) the results obtained;

(8) the degree to which fees were incurred to enforce existing orders or to compel discovery; and

(9) any other factor bearing on the fairness of an award.

[R. 5:3-5(c).]

We are persuaded the court properly exercised its discretion to award counsel fees and costs in this case. The court analyzed the appropriate factors set forth in Rule 5:3-5(c) and explained its reasons for the award. It found defendant's litigation positions were unreasonable and caused plaintiff to incur unnecessary fees. The court awarded a portion of the total fees and costs sought "in recognition of the last several invoices that she had to pay" due to defendant's "stubbornness and refusal to negotiate in good faith."

Defendant's claim that plaintiff's counsel failed to submit a certification of services is not supported by the record. In fact, it is apparent from the court's analysis that a certification of services was submitted. In its decision, the court determined the rates charged by plaintiff's counsel were reasonable and

24

indicated it reviewed the relevant invoices to determine the amount of the award. There is no basis for us to disturb the court's award of counsel fees and costs. Nothing in this opinion should be interpreted to preclude plaintiff from seeking an award of additional fees and costs or to preclude the court from modifying or vacating the award of counsel fees and costs on remand.

Affirmed in part, reversed and vacated in part, and remanded for proceedings in conformity with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

25